[1] Reported in 142 P.2d 498.
The Pacific Telephone Telegraph Company is a California corporation, owning and operating a telephone system throughout the states of Washington, Oregon, northern California, and a small portion of the state of Idaho. The company furnishes in the state of Washington both intrastate and interstate telephone service, and is a public service company within the scope of the "public service commission law" (Rem. Rev. Stat., § 10339 [P.C. § 5528] et seq.) During the month of June, 1938, the company filed with the department of public service of Washington *Page 205 
rate schedules designed to increase its net revenue. These schedules included a tariff providing for increases over the preexisting rates for intrastate message toll telephone service over routes longer than fifty-six miles air line, and a tariff directing the passing on, by the company, to its customers in six cities, of municipal occupation taxes levied by those cities against the company. June 25, 1938, the department, by order, suspended these tariffs, and two days later the company filed a tariff providing for changes in the preexisting rates for exchange telephone service in the city of Seattle, which latter tariff the department suspended by order dated June 29, 1938.
March 31, 1939, the department, on its own motion, filed a complaint instituting an investigation of the rates and practices of the company in the conduct of its telephone business within the state of Washington. May 10, 1939, the company filed a tariff providing for changes in telephone rates to become effective in all the company's telephone exchanges in the state of Washington, with the exception of the cities of Seattle and Clarkston. May 19th, the department, by order, suspended this tariff. Thereafter, the department, by order, consolidated for hearing all the tariffs which had been filed by the company, and which the department had suspended, together with the proceeding which had been instituted by the department, above referred to. Hearings were held before the department from July 28, 1939, until May 1, 1940. It was estimated that the company, from the rates set forth in its tariff filings, would have derived an increase in net revenue for the year 1940 in an amount exceeding $1,300,000.
July 6, 1940, the department entered an order permanently suspending all the tariffs above mentioned, which had been filed by the company, and directing the company to cancel these tariffs (34 P.U.R. 193). The order further provided that the department retained jurisdiction of the proceeding for the purpose of conducting a general investigation of the company's rates and practices. The company seasonably, by writs of review and supersedeas, *Page 206 
brought this order before the superior court for revision. It was stipulated that the company should not be penalized for disobeying the order of July 6th, pending order of the superior court upon the company's application for supersedeas.
October 31, 1940, the department entered an order in the proceeding instituted by the department, which order effected a general rate reduction. The company, by writ of review, brought this order before the superior court, and the matter was consolidated for hearing before that court, with the other order above referred to.
December 17, 1940, the company having failed to file new rate schedules as directed by the October order, the department entered an order establishing rate schedules in conformity with the October order. The company brought this order before the superior court for review, as did various cities who desired a judicial review of both the October and December orders. All the petitions for review were consolidated for hearing before the superior court, and have been consolidated for hearing before this court.
After lengthy hearings, the superior court, July 18, 1941, filed its memorandum opinion, and September 29, 1941, entered its decree, the material portions of which read as follows:
"Now, THEREFORE, in compliance with paragraph 10428 of Remington's Revised Statutes, the court hereby renders its decree:
"IT IS ORDERED, ADJUDGED AND DECREED that the following findings made by the Department of Public Service of Washington of July 6th, October 31st, or December 17th, 1940, are erroneous in the following particulars:
"1. The Department in its determination of fair value of relator's property for rate-making purposes failed to include property in Account No. 100.3, denominated `Property Held for Future Use.' The relator is entitled to earn a return on the property included in Account No. 100.3 and all of such property should be included in the determination of the fair value of relator's property for rate-making purposes.
"2. The Department in its determination of fair value of relator's property erred as a matter of law in finding *Page 207 
that the fair value of such property was its original cost less the depreciation reserve. The Department must, in determining the fair value of relator's property, give consideration to the cost of reproduction of such property, less existing depreciation. Existing depreciation must be determined by physical inspection, in so far as practicable, giving due consideration to other causes of retirement of property such as inadequacy, obsolescence, changes in the art, and requirements of public authorities.
"3. The findings of the Department, determining the amount and nature of operating expenses to be deducted from gross revenue, are in error in the following particulars:
"(a) Disallowance of license fees paid by relator to the American Telephone and Telegraph Company under the license contract with that company and charged to Washington state operations.
"(b) Disallowance of payments made by relator to the trustee under the pension plan to provide for the cost of pensions.
"The disallowance of both said payments was erroneous as a matter of law and all such charges should be included as necessary operating expenses.
"4. The Department erred in fixing the fair rate of return which relator is entitled to earn on the fair value of its property at 5%. As a matter of law and fact a fair return upon such fair value is not less than 6%.
"The other findings made by the Department of Public Service of Washington either on July 6th, October 31st, or December 17th, 1940, are neither approved nor disapproved.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the orders of the Department of Public Service of Washington, dated July 6th, October 31st, and December 17th, 1940, except insofar as they refer to the station to station method of rate-making as contradistinguished from the board to board method of rate-making and the change to measured service in Seattle, (the above is not to be taken as an affirmance or disaffirmance of the Department) and each of them, be and they are hereby reversed and the proceedings remanded to the Department of Public Service of Washington for further proceedings in accordance with this decree.
"The respondents are hereby allowed an exception to all parts of the above and foregoing decree." *Page 208 
From this decree, the department of public service of Washington (herein referred to as the department) has appealed; Telephone Users' League of Washington, Inc., has also appealed; and the cities of Seattle, Spokane, Tacoma, Yakima, Bellingham, together with other cities, have cross-appealed. Argument before this court was, by agreement of the parties, delayed until June 15, 1943.
We shall first consider the department's appeal.
The department assigns error upon that portion of the decree reversing the department's orders of July 6th, October 31st, and December 17th, 1940, and remanding the proceedings to the department for further consideration. Error is also assigned upon the vacation of the department's findings and order establishing the fair value of the company's property for rate-making purposes; upon the vacation of that portion of the department's order disallowing, as an operating expense, the license fee payments made by the company to the American Telephone 
Telegraph Company; upon the vacation of the department's order disallowing, as an operating expense, moneys placed by the company in its private pension fund; and upon the vacation of the department's order fixing five per cent as a fair rate of return to be earned by the company upon its property within the state of Washington.
[1] Appellant caused to be prepared and filed in the superior court a proposed statement of facts to be used as a portion of the record on this appeal, the proposed statement containing matters which occurred during the hearing before the superior court. Respondent moved the superior court to strike the proposed statement, and the superior court granted the motion. Appellant then brought the matter before this court by way of a writ of certiorari, for the purpose of reviewing the order referred to. This court reviewed the order, and held that the superior court erred in striking the proposed statement of facts, and reversed the order. State ex rel. Department of Public Service v.Wilson, 12 Wn.2d 614, 123 P.2d 341. Upon the receipt of the remittitur, the superior court certified appellant's proposed *Page 209 
statement of facts, and the same was forwarded to this court as a portion of the record on appeal. Respondent moved this court to strike the statement of facts, and the motion was passed to the merits for consideration.
Respondent argues that, as the statute provides that on review by the superior court of an order entered by the department,
". . . Such cause shall be heard by the court without the intervention of a jury on the evidence and exhibits introduced before the department and certified to by it, . . ." Rem. Rev. Stat. (Sup.), § 10428 [P.C. § 5613],
and that, on appeal from a decree of the superior court,
". . . The original transcript of the record and testimony filed in the superior court in any action to review an order of the commission, together with a transcript of the proceedings in the superior court, shall constitute the record on appeal to the supreme court. . . ." Rem. Rev. Stat., § 10430 [P.C. § 5615],
this court must determine the appeal solely upon the record made before the department and a transcript of appropriate superior court files.
In this connection, respondent cites the case of State ex rel.Country Club v. Department of Public Service, 198 Wn. 37,86 P.2d 1104, in which we said:
"They [relators] call attention to the fact that our statutes provide for a complete transcript of all testimony [before the department] (Rem. Rev. Stat., § 10423 [P.C. § 5608]), and that provision is made for review on this record alone, both by the superior court (§ 10428 [P.C. § 5613]), and by this court (§ 10430 [P.C. § 5615])."
Such an appeal as this brings before us the judgment of the superior court. As we said In re Foy, 10 Wn.2d 317,116 P.2d 545, "We have before us for review the judgment of the superior court, not the rulings of the administrative tribunal."
It would seem that matters might have transpired before the superior court which would be relevant on an appeal from the judgment which that court entered. The parties might have agreed upon a finding or a ruling to be made *Page 210 
by the court, or one party might have proposed a finding which the court adopted. Certainly these matters could not be completely reviewed by this court without knowledge of what had happened before the court below.
Rem. Rev. Stat. (Sup.), § 10428, supra, provides that the superior court shall review an order of the department of public service "on the evidence and exhibits introduced before the department." Rem. Rev. Stat., § 10430, supra, relative to an appeal to this court from the superior court, refers to "the original transcript of the record and testimony filed in the superior court . . . together with a transcript of the proceedings in the superior court," as constituting the record on appeal. The sections apply specifically to reviews and appeals from orders of the department of public service. In § 10430, the legislature used the word transcript, referring to the recordand testimony taken before the department, and then provided for "a transcript of the proceedings in the superior court." This section does not refer to the transcript of the files, but uses the word proceedings, which includes all matters which occurred before the superior court, both by way of papers which became properly a portion of the clerk's files, as well as matters which transpired in open court.
This section should be construed liberally in aid of our appellate jurisdiction, and we hold that, in using the word transcript the second time, the legislature intended to include not only a transcript of pertinent portions of the clerk's file but a written record of such proceedings before the court by way of a statement of facts or bill of exceptions as are deemed pertinent to a consideration of the questions to be presented on appeal to this court. A statement of facts is often referred to as a transcript of the testimony, which in fact it is, and while in the trial before the superior court no testimony was admissible, other things may have occurred which should be considered by this court on appeal.
Of course, this court, on appeal from a decree of the superior court reviewing a departmental order, in so far as *Page 211 
the evidence upon which that order was based is concerned, may consider only the record made before the department, but nevertheless on such an appeal we are required to review the judgment of the superior court.
We hold, then, that, if a party to such an appeal as this deems matters which occurred before the superior court to be relevant and of importance to a proper determination of the questions to be decided, such matters may be made a part of the record on appeal by statement of facts or bill of exceptions. Whether or not matters contained in such a document are pertinent and may properly be considered by this court in deciding the questions presented is, of course, a matter to be determined as to each particular item contained in such a statement of facts.
The motion to strike the statement of facts is denied.
The hearings conducted by the department in the matter now before us consumed months, and involved a vast amount of research and study. Prior to the entry of the order of July 6, 1940, the department had devoted ninety days to hearing the matters at issue, five hundred exhibits had been filed, and ten thousand typewritten pages of testimony had been adduced. After calling attention to these matters, the department said: "This is by far the most complex case and the most voluminous record which this department has ever had before it." The record, of course, was considerably enlarged as the result of subsequent hearings.
By its first assignment of error, appellant department states its contention that the trial court erred in reversing the three departmental orders above referred to. By its decree, the court vacated five specific portions of the July and October orders. The decree then reversed all the orders (except two provisions of the October order), and remanded the proceeding to the department.
The decree was prepared, as it recites, in compliance with Rem. Rev. Stat. (Sup.), § 10428, which, referring to a review of the departmental order before the superior court, provides: *Page 212 
"Such cause shall be heard by the court without the intervention of a jury on the evidence and exhibits introduced before the department and certified to by it. Upon such hearing the superior court shall enter judgment either affirming or setting aside or remanding for further action the findings or order of the department under review. . . . In case such findings or order be set aside, or reversed and remanded, the court shall make specific findings based upon evidence in the record indicating clearly all respects in which the department's findings or order are erroneous."
Appellant contends that by the decree no fact found by the department was set aside or reversed, and that on appeal it must be held that all of the findings of fact made by the department were, in effect, affirmed by the trial court, and that for this reason the court did not, and indeed could not, make any of the specific findings referred to in the quoted portion of § 10428. Appellant then argues that the trial court disagreed with the department only as to certain conclusions of law, and that therefore the sole question before this court is, "Do the department's findings support the department's orders? If they do, the department's orders must be affirmed." Appellant argues that, pursuant to the writs of review, the superior court was required to determine only one ultimate question, namely: Were the rates promulgated by the department in its December order just and reasonable, or were they obnoxious to the argument that they were arbitrary and confiscatory, in that they deprived respondent of its property without due process of law?
Appellant also contends that any errors contained in the departmental record were and are immaterial if the ultimate finding of the department, fixing rates, does not result in confiscation, and that, as the trial court did not specifically find that the carrying out of the departmental orders would result in confiscation of respondent's property, the reversal of the departmental orders was erroneous.
By the decree appealed from, supra, the court, after stating in four numbered paragraphs that certain "findings" of *Page 213 
the department were erroneous, continued by stating that the other "findings" made by the department "are neither approved nor disapproved."
Appellant contends that, as the department found that the rates which it established by its order were adequate, fair, and sufficient, it should now be held that this finding was approved by the superior court, and that, the trial court having made no specific findings that this and other findings were erroneous, the departmental order of December 17, 1940, fixing rates, should be affirmed.
The sum of appellant's argument is that, under § 10428,supra, the trial court not having specifically set aside any of the findings of the department, the findings stand affirmed, and the only question before this court is whether or not the findings support the orders of the department.
The trial court had before it the complete departmental record, including all the evidence, the findings, and the orders which the department entered. By its decree, the superior court held that the department had acted illegally (1) in the method followed in determining the fair value of respondent's property for rate-making purposes; (2) in excluding, from the amount of respondent's disbursements to be allowed as operating expenses, moneys paid under the so-called license contract and in maintaining respondent's system of pensions; and (3) in fixing five per cent as the rate of return to be realized by respondent upon the fair value of its property used and useful in the public service.
[2] The questions before us are limited to those presented by appellant's appeal from the decree of the superior court. Clearly, if the proceeding was to be remanded to the department for further action, the department should be left free to consider any and all questions pertaining to the matter, and should not be hampered, or the scope of its future inquiry limited, by any contention that certain of its findings had been affirmed by the superior court, and that those matters were therefore closed to further investigation or consideration. *Page 214 
Upon this appeal, no question is before us concerning any portion of the department's orders, save those referred to in the decree of the superior court, and such portions of the orders as are dependent thereon.
[3] In proceedings such as this, it is often very difficult to determine the dividing line between questions of fact and questions of law. In rate cases, these questions are not divided by any sharp line of demarcation. The questions here presented are of law, rather than of fact.
In the case of Mallinger v. Webster City Oil Co., 211 Iowa 847,849, 234 N.W. 254, the supreme court of Iowa said:
"Where the ultimate conclusion can be arrived at only by applying a rule of law, the result so reached embodies a conclusion of law, and is not a finding of fact."
The case cited arose under the workmen's compensation statute of the state of Iowa, but the clear and comprehensive statement above quoted applies with equal force to such a proceeding as that now before us.
In the case of Ohio Bell Tel. Co. v. Public UtilitiesCommission, 301 U.S. 292, 304, 81 L.Ed. 1093, 57 S.Ct. 724, the supreme court, speaking through Mr. Justice Cardozo, said:
"Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it hasbeen reached with due submission to constitutional restraints.
[Citing cases.] Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed. All the more insistent is the need, when power has been bestowed so freely, that the `inexorable safeguard' (St. Joseph Stock Yards Co. v. United States,298 U.S. 38, 73) of a fair and open hearing be maintained in its integrity." (Italics ours.)
[4] The department of public service of Washington is a legislative agency possessed only of the powers conferred upon it by the constitution of this state and legislative enactments. In its proceedings, it is at all times subject to limitations imposed by the Federal constitution and by the *Page 215 
constitution of our state. As such a legislative agency, the department has power, and it is its duty, to gather facts and consider evidence, and, based upon the record which has been made before it, to fix or approve fair and reasonable rates which a public utility may charge for its service. In the course of its operations, the department necessarily covers much ground, and is required to consider many extremely complicated questions of fact in the light of established law, which is also complicated, and which is still, in some of its phases, new. Courts have naturally experienced much difficulty in determining the principles which govern proceedings before rate-making authorities, and questions which have not yet been definitely settled sometimes arise.
[5] In all jurisdictions, the rate-making authority is required to gather facts upon which to base an order affecting rates, and from those facts make findings which support the order entered. Upon review, the courts may always scrutinize those facts, for the purpose of determining whether or not the findings have been arbitrarily or capriciously made. Interstate CommerceCommission v. Louisville N.R. Co., 227 U.S. 88, 57 L.Ed. 431,33 S.Ct. 185; Florida v. United States, 282 U.S. 194, 212,75 L.Ed. 291, 51 S.Ct. 119; United States v. Carolina FreightCarriers Corp., 315 U.S. 475, 86 L.Ed. 971, 62 S.Ct. 722.
[6] In all its proceedings, the regulatory body must act strictly within its statutory authority, within constitutional limitations, and in a lawful manner. United States v. CarolinaFreight Carriers Corp., supra; State ex rel. Puget Sound Power Light Co. v. Department of Public Works, 179 Wn. 461,38 P.2d 350.
Orders of the department may be reviewed as to constitutional questions inhering therein, and such orders should also be scrutinized for the purpose of arriving at a judicial decision as to whether or not the department has acted arbitrarily. Floridav. United States, supra; Mitchell v. United States, 313 U.S. 80,85 L.Ed. 1201, 61 S.Ct. 873; Gray v. *Page 216 Powell, 314 U.S. 402, 86 L.Ed. 401, 62 S.Ct. 326; HobokenManufacturers' R. Co. v. United States, 47 F. Supp. 779.
In the case of Interstate Commerce Commission v. Louisville N.R. Co., 227 U.S. 88, 91, 57 L.Ed. 431, 33 S.Ct. 185, the court considered certain railroad rates fixed by the commerce commission, and, speaking through Mr. Justice Lamar, referring to the order of the commission under attack, said:
"A finding without evidence is arbitrary and baseless. And if the Government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our Government. It would mean that where rights depended upon facts, the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however beneficently exercised in one case, could be injuriously exerted in another; is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power."
In the case of State ex rel. Model Water Light Co. v.Department of Public Service, 199 Wn. 24, 90 P.2d 243, we said:
"The findings of the department are to be given the same weight accorded to any impartial tribunal, and may not be overturned unless the clear weight of the evidence is against its conclusions, or unless it has mistaken the law applicable to the matter adjudicated, or, as sometimes expressed, unless the findings show evidence of arbitrariness and disregard of the material rights of the parties to the controversy."
This portion of the opinion in the case cited was quoted with approval in the cases of State ex rel. O.W.R. N. Co. v. WallaWalla County, 5 Wn.2d 95, 104 P.2d 764, and ManloweTransfer etc. Co. v. Department of Public Service, 18 Wn.2d 754, 140 P.2d 287.
In this state, the statute provides for judicial consideration of departmental orders by way of a writ of review to the superior court, which court must hear and determine questions presented upon the evidence taken before the department. Questions which have been determined by this court upon appeals from reviews of orders entered by *Page 217 
other statutory fact-finding bodies are not necessarily in point upon questions presented in connection with consideration of orders entered by appellant department, as the statutes constituting the respective authorities may differ.
[7] In the case at bar, it was the province of the trial court to review the departmental orders before it and determine whether or not the department (1) had correctly followed the statutes as to matters of procedure, (2) had failed to grant respondent a fair hearing, (3) in making its findings and orders, had acted arbitrarily or capriciously, or (4) had violated rights secured to respondent by the constitution of the United States or the constitution of the state of Washington, or, as so often stated in our decisions, had, in reaching its results, proceeded upon a fundamentally wrong basis.
The trial court was bound by no conclusion of the department as to any question of law, always observing the rule that the burden of proof rested upon the party attacking the order. State exrel. Kitsap County Transportation Co. v. King County, 3 Wn.2d 392, 101 P.2d 327; State ex rel. Case v. Public ServiceCommission, 298 Mo. 303, 249 S.W. 955; Clear Creek Oil GasCo. v. Ft. Smith Spelter Co., 161 Ark. 12, 255 S.W. 903.
This rule applies whether questions presented concern constitutional or statutory limitations. Los Angeles Gas etc.Corp. v. Railroad Commission, 289 U.S. 287, 304, 77 L.Ed. 1180,53 S.Ct. 637.
In the case of Smyth v. Ames, 169 U.S. 466, 42 L.Ed. 819,18 S.Ct. 418, the supreme court laid down the rule that, if a rate prescribed by a rate-making authority does not yield a fair return upon the value of the utility's property, the rate is confiscatory, and the order establishing the same is void upon constitutional grounds. The doctrine of the Smyth case has been consistently followed by the supreme court and by state courts, including the courts of the state of Washington. State ex rel.Puget Sound Power Light Co. v. Department of Public Works,179 Wn. 461, 38 P.2d 350. *Page 218 
 [8] The power of the courts to determine constitutional questions cannot be limited by statutes constituting rate-making authorities, or by statutes purporting to regulate judicial consideration of the orders of such statutory authorities.
[9] In the case at bar, the basic question presented is whether or not the rate of return fixed by the departmental orders will accord respondent a fair return upon the fair value of its property; in other words, whether enforcement of the orders of the department will result in taking the property of respondent without due process of law, in violation of the provisions of the Federal and state constitutions. In determining whether a rate fixed by a regulatory body is fair or confiscatory, neither the findings nor conclusions of the department are binding upon the courts. Individual judges have dissented from this proposition, but the rule has been clearly stated by the supreme court of the United States. In the case ofOhio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 289,64 L.Ed. 909, 40 S.Ct. 527, the court said:
"The order here involved prescribed a complete schedule of maximum future rates and was legislative in character. In all such cases, if the owner claims confiscation of his property will result, the State must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, Fourteenth Amendment."
The rule was approved in the case of St. Joseph Stock YardsCo. v. United States, 298 U.S. 38, 80 L.Ed. 1033, 56 S.Ct. 720,infra.
The reasoning of the cases decided by the supreme court of the United States has been adopted and approved by the state courts.Southern California Edison Co. v. Railroad Commission, 6 Cal.2d 737,59 P.2d 808; Otis Elevator Co. v. IndustrialCommission, 302 Ill. 90, 134 N.E. 19; East Ohio Gas Co. v.Public Utilities Commission, 133 Ohio 212, 12 N.E.2d 765;Pacific Tel. Tel. Co. v. Wallace, *Page 219 158 Ore. 210, 75 P.2d 942; Wisconsin Tel. Co. v. Public ServiceCommission, 232 Wis. 274, 287 N.W. 122, 593; Application ofN.W. Bell Tel. Co., 6 N.W.2d (S.D.) 165, 171.
[10] Appellant argues that "unless the orders of the department in totality of their effect confiscate the property [of respondent], the order of the department establishing the rate schedules must be affirmed." Appellant then says: "The findings of the department establish that the ordered rates are not confiscatory, but are fair and reasonable." If we understand appellant correctly, appellant argues that a finding having been made that the rates were reasonable, the court is bound thereby, unless it be held that the evidence does not support the order. In advancing this proposition, appellant apparently would limit judicial review to the question of whether or not on the facts the department acted arbitrarily and capriciously, losing sight of the rule that the courts may always decide whether or not the department has acted within its prescribed legal limitations, and has observed the rules of law governing such investigations and the resulting departmental orders. It is not the law that a rate-making authority may, by making a finding that certain rates are reasonable, preclude judicial review of its methods and processes in reaching such a finding, which, after all, in effect is a conclusion.
In the case of St. Joseph Stock Yards Co. v. United States,298 U.S. 38, 50, 80 L.Ed. 1033, 56 S.Ct. 720, the court, speaking through Mr. Chief Justice Hughes, said:
"The fixing of rates is a legislative act. In determining the scope of judicial review of that act, there is a distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. Exercising its rate-making authority, the legislature has a broad discretion. It may exercise that authority directly, or through the agency it creates or appoints to act for that purpose in accordance with appropriate standards. The court does not sit as a board of revision to substitute its judgment for that of the legislature or its agents as to matters within the province of either. . . . When the legislature itself acts within the broad field of legislative discretion, its determinations *Page 220 
are conclusive. When the legislature appoints an agent to act within that sphere of legislative authority, it may endow the agent with power to make findings of fact which are conclusive, provided the requirements of due process which are specially applicable to such an agency are met, as in according a fair hearing and acting upon evidence and not arbitrarily. . . . In such cases the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings, and the question of the weight of the evidence in determining issues of fact lies with the legislative agency acting within its statutory authority.
"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. Thelegislature cannot preclude that scrutiny and determination byany declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation." (Italics ours.)
The right to determine the constitutionality of a rate inheres in the courts, and the judicial power cannot be impaired by any statute establishing either the authority of the regulatory body or the manner in which it shall perform its functions. Of course, orders of such authority stand unless brought before the courts for review; that is a matter of procedure only. However, once brought before the courts, the parties are entitled to an independent judicial review of the constitutional questions presented, which are to be heard and decided after consideration both of the facts and the law. St. Joseph's Stock Yards Co. v.United States, supra. A departmental finding that ordered rates are reasonable cannot prevail if it appears to the court that the regulatory authority has proceeded on a fundamentally *Page 221 
wrong basis, or if it has acted arbitrarily or capriciously. In the case at bar, the decree appealed from declared that, in making the orders before the court for review, the department had proceeded illegally and without warrant of law, and no conclusion which the department reached upon improper bases can convert that wrong into right.
Appellant argues that the trial court not having specifically disapproved the rates as fixed by the department, but having disapproved only certain of the methods by which the rates were determined, the rates fixed by the department must stand, citing in support of its argument the case of West Ohio Gas Co. v.Public Utilities Commission, 294 U.S. 63, 79 L.Ed. 761,55 S.Ct. 316.
The case cited came before the court on appeal of the public utilities commission fixing the rates to be charged by a public utility engaged in the business of selling gas. The supreme court reversed the judgment of the state supreme court, and remanded the cause for further proceedings. Appellant relies upon the following portion of the opinion (p. 70):
"We do not now decide that there would be a denial of due process through the spread of distributing costs over the total area of service, if the new method of allocation had been adopted after timely notice to the company and then consistently applied. This court does not sit as a board of revision with power to review the action of administrative agencies upon grounds unrelated to the maintenance of constitutional immunities. LosAngeles Gas Electric Corp. v. Railroad Commission ofCalifornia, 289 U.S. 287. Our inquiry in rate cases coming here from the state courts is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation. If this level is attained, and attained with suitable opportunity through evidence and argument (Southern Ry. Co. v. Virginia, 290 U.S. 190) to challenge the result, there is no denial of due process, though the proceeding is shot through with irregularity or error."
In connection with the case cited, it must be remembered that the supreme court of the United States, in reviewing *Page 222 
judgments of the supreme court of a state in connection with rate-making proceedings, is required to consider only constitutional questions, while a state supreme court, in reviewing the order of an authority such as appellant department, reviews not only questions arising under the Federal constitution, but questions arising under the state constitution and the statute law of the jurisdiction, and also questions presented under the general law applicable to the regulation of utility rates by a state authority. While a court might uphold rates fixed by a regulatory authority if it appeared that the rates would allow the utility, all things considered, a fair return, even though the authority in its proceedings had committed error, no court is obliged to follow that method, and it seems clear that such a method would be followed only in exceptional cases. It should be noted that, in the case cited, in addition to holding that the utility had not been accorded a fair hearing before the commission, the court directed that an item of disbursement be added to the yearly operating expenses. In this connection, the opinion of the supreme court in the case of Westv. Chesapeake Potomac Tel. Co., 295 U.S. 662, 79 L.Ed. 1640,55 S.Ct. 894, infra, should also be considered.
[11] In the case at bar, the method adopted by the department in several branches of its inquiry and action was basically and fundamentally erroneous, the errors being carried over into its orders. As it is the province of the department and not of the superior court or of this court originally to determine the matters in connection with which the department erred, the trial court correctly ruled that the cause should be remanded to the department, with instructions to enter new orders based upon proper and lawful methods of procedure. The errors disclosed in the proceedings before the department so seriously affected the results reached by the department in the orders which it entered, that it must be held that, in the net results of the orders, respondent's constitutional rights were infringed. *Page 223 
 [12] In the case of Smyth v. Ames, 169 U.S. 466,42 L.Ed. 819, 18 S.Ct. 418, the supreme court laid down the rule that to be valid a rate must be determined upon a legal rate base, and that the regulatory authority, in establishing a rate or approving one already made, must consider all essential elements that enter into the matter of rate-making. In the case at bar, the superior court properly held that the questions of whether or not the department had erred in excluding certain parcels of real estate from the rate base, in following the method adopted by the department in fixing the fair value of respondent's property for rate-making purposes, in excluding from operating expenses sums paid by respondent under the license contract and the pension plan, were questions of law to be determined by the court. Any question suggesting that the net return allowed by the department is so low as to amount to confiscation is also a question of law.
In the case of St. Louis O'Fallon R. Co. v. United States,279 U.S. 461, 487, 73 L.Ed. 798, 49 S.Ct. 384, the court said:
"It was deemed unnecessary by the Court below to determine whether the Commission obeyed the statutory direction touching valuations since the order permitted The O'Fallon to retain an income great enough to negative any suggestion of actual confiscation. With this we cannot agree. Whether the Commission acted as directed by Congress was the fundamental question presented. If it did not, the action taken, being beyond the authority granted, was invalid. The only power to make any recapture order arose from the statute."
In the case of Northern Pac. R. Co. v. Department of PublicWorks, 268 U.S. 39, 44, 69 L.Ed. 836, 45 S.Ct. 412, is found the following:
"The Department's error was fundamental in its nature. The use of this factor in computing the operating costs of the log traffic vitiated the whole process of reasoning by which the Department reached its conclusion.
"The mere admission by an administrative tribunal of matter which under the rules of evidence applicable to judicial proceedings would be deemed incompetent, United *Page 224 States v. Abilene Southern Ry., 265 U.S. 274, 288, or mere error in reasoning upon evidence introduced, does not invalidate an order. But where rates found by a regulatory body to be compensatory are attacked as being confiscatory, courts may enquire into the method by which its conclusion was reached."
In the case of State ex rel. Puget Sound Power Light Co. v.Department of Public Works, 179 Wn. 461, 38 P.2d 350, this court followed the principle that rates established by the department must rest on a fundamentally sound legal basis.
In the case of West v. Chesapeake Potomac Tel. Co.,295 U.S. 662, 79 L.Ed. 1640, 55 S.Ct. 894, the court followed the principle that the method employed by the rate-making authority in determining a rate was subject to judicial examination, and that, if it appeared that the authority followed a method proscribed by law, the findings made by the authority were arbitrary and illegal. In the case cited, it appeared that the rate-making authority had used certain price trend indices in determining the rate base. In holding that the authority had proceeded illegally, the court said:
"We agree, therefore, with the view of the district court, that the method was inapt and improper, is not calculated to obtain a fair or accurate result, and should not be employed in the valuation of utility plants for rate making purposes. As that court observed, it is not the function of a tribunal inquiring into the question of confiscation to set aside the legislative finding for mere errors of procedure. The duty of a court is merely to ascertain whether the legislative process has resulted in confiscation. In Los Angeles Gas Electric Corp. v. RailroadCommission, supra, [289 U.S. 287], this court said:
"`The legislative discretion implied in the rate making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go *Page 225 
beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory.'
"The language was used in respect of the claim that values of various elements had been ignored by the commission. It was found, however, that though error might have been committed in respect of the items specified, other allowances neutralized the possible error. See, also, Dayton, P. L. Co. v. PublicUtilities Comm'n, 292 U.S. 290, 306. Nothing said in either of these cases justifies the claim that this court has departed from the principles announced in earlier cases as to the value upon which a utility is entitled to earn a reasonable return or the character of evidence relevant to that issue. It is apparent from what has been said that here the entire method of the Commission was erroneous and its use necessarily involved unjust and inaccurate results. In such a case it is not the function of a court, upon a claim of confiscation, to make a new valuation upon some different theory in an effort to sustain a procedure which is fundamentally faulty."
In the case of Pacific Tel. Tel. Co. v. Thomas, 13 P.U.R. (N.S.) 337, the circuit court of Multnomah county, Oregon, three judges sitting, enjoined certain rate provisions contained in an order of the commissioner of public utilities of Oregon. In the course of an exhaustive opinion, the court said:
"We have discussed the power and duty of the court to inquire into the facts relative to substantive confiscation. It is no less our duty to test the procedure of the Commissioner by the due process clause of the Constitution. The fine line between substantive and procedural due process has not as yet been drawn by the Supreme Court. Certain decisions indicate that neither errors of law nor mistakes of fact will induce the Federal courts, sitting only on the constitutional question, to enjoin a rate order unless upon the whole case the enforcement of the order would result in substantive confiscation. [Citing cases].
"On the other hand, the propriety of a method used is always open to review and criticism when the validity of the result is the subject of inquiry. And it appears that, though administrative orders will not be enjoined for mere error in method or reasoning, nevertheless if the entire process is pervaded by the employment of an improper method so that the result is controlled thereby, then the *Page 226 
Supreme Court will condemn the commission's action as a violation of the due process clause from the procedural standpoint without inquiring into the question of substantive confiscation.
"This conclusion may be reached in case of a wrongful refusal to consider and employ an essential method (St. Louis O'FallonR. Co. v. United States, 279 U.S. 461), . . . and may also be reached when an improper and controlling method of valuation has been employed, as clearly appears in the case of West v.Chesapeake P. Teleph. Co. (1935), 295 U.S. 662. . . . If the error in method so pervades the result as to deprive the utility of procedural due process of law, then we would be entitled to enjoin the order without proceeding further."
The commissioner of public utilities appealed from the decree entered by the circuit court to the supreme court of Oregon, which affirmed the decree of the circuit court. Pacific Tel. Tel. Co. v. Wallace, 158 Ore. 210, 75 P.2d 942.
The trial court, in entering its decree in the manner and form as rendered, proceeded within its judicial power. Being of the opinion that the department had erred in the particulars specified in the decree, the trial court followed the proper method in preparing its decree, and the provisions thereof indicate the trial court's reasons for the reversal of the orders before it for review. While the court might, had it desired, have made further findings, the court was not required to do so; and, upon appeal from the decree, it becomes the duty of this court to consider the case upon the merits, and decide all questions presented by appellant's assignments of error, based upon specific portions of the decree appealed from.
[13] Appellant contends that the trial court erred in directing that there be included in the rate base certain property referred to in the decree as property in account No. 100.3, which property the department had excluded upon the ground that the same was not used and useful in service. It is admitted that, at the time of the entry of the department's orders, the property was not used by respondent in the conduct of its business. The items consisted of *Page 227 
three parcels of real estate and a considerable amount of underground conduit which had been installed for future use.
Of the three parcels of real estate, one, a tract in Centralia, had been acquired in 1929, with the expectation that a building to house repeater equipment would be constructed thereon. On respondent's books this property was carried at a valuation of something over thirty-three thousand dollars. The lot in Hoquiam, which cost twenty-five hundred dollars, adjoins respondent's exchange building, and was purchased for the purpose of enabling respondent to extend its present building when necessary, probably by 1947. The tract in Seattle, consisting of the southwest corner of Third avenue and Madison street, was also acquired in 1929, when respondent's business was rapidly expanding, and it appeared that it would be sound economy to construct an additional building in Seattle for the Washington-Idaho area. This property is carried on the company's books at a valuation of a little less than three hundred sixteen thousand dollars. Soon after this property was acquired, respondent's business ceased to expand, due to the prevalent depression, and it was considered that it was inadvisable to construct the office building. The building now owned by respondent in Seattle is wholly inadequate, and respondent is now renting much office space to house its employees. The evidence indicates that it would be advantageous for respondent to construct a building upon the property referred to, when building operations again become possible at a reasonable cost.
Under Rem. Rev. Stat. (Sup.), § 10441, the department is authorized to ascertain and determine, for rate-making purposes, the fair value of property owned by any public service company, used and useful for service in this state. Appellant contends that the parcels of real estate above referred to do not fall within the classification "used and useful for service," and for this reason were properly excluded by the department in determining the amount of the rate base. *Page 228 
In support of its argument, appellant cites the case ofColumbus Gas Fuel Co. v. Public Utilities Commission,292 U.S. 398, 78 L.Ed. 1327, 54 S.Ct. 763, 91 A.L.R. 1403, in which the supreme court held that real property not presently in use need not be included in the rate base unless the time for using it is so near that it may properly be held to have the quality of working capital.
In the case of St. Joseph Stock Yards Co. v. United States,11 F. Supp. 322 (affirmed 298 U.S. 38), the court said:
"The matter of including or excluding land or property held for business expansion in the rate base is the matter of who — the ratepayers or the company — shall carry property which is not being used to produce the service paid for by the rate. Obviously, it may be proper and good business judgment may sometimes dictate provision for future expansion of the business. It is equally clear that, so far as the present ratepayers are concerned, there must be a limit to the extent to which they can be compelled to pay for providing possible future facilities for future business. While a broad power and discretion must be left undisturbed in company management, yet, even as to expenditures directly entering into the present service for which the now customer pays, this discretion is not beyond control. West OhioGas Co. v. Public Util. Comm., 294 U.S. 63, 55 S.Ct. 316,79 L.Ed. 761, decided Jan. 7, 1935; Western Distributing Co. v.Commission, 285 U.S. 119, 124, 126, 52 S.Ct. 283, 76 L.Ed. 655. It would seem that such control should be much more extensive where the expenditure has no part whatsoever in furnishing the service paid for. In fact, the general doctrine is that the rate base is made up of values used in furnishing the service."
In the case of Denver Union Stock Yard Co. v. United States,57 F.2d 735, it was held that certain vacant lands acquired for future expansion had been improperly excluded from the rate base by the secretary of agriculture, who, pursuant to7 U.S.C.A. § 181 et seq., had instituted a proceeding for the purpose of inquiring into the reasonableness of plaintiff's charges for its services. The court held that certain tracts of real estate had been acquired in good faith, for the purposes of expansion of the company's facilities, which it appeared to the directors would be required *Page 229 
before any considerable lapse of time. The court discussed the power of the regulatory authority at considerable length, holding that the real estate had been improperly excluded from the rate base.
We are convinced that the tracts of real estate above referred to were purchased by respondent in good faith, with every reasonable expectation that they would before long be improved by buildings which would be used in the course of the company's business. While some years have elapsed since the purchase of the property, we hold that at this time it should be included in the rate base. The trial court did not err in directing the department to consider these tracts of real estate in computing the valuation of respondent's property.
The department also excluded from the rate base certain construction consisting of underground conduits held for future use. By far the major portion of this construction at the time of the department's ruling consisted of a conduit installed in 1930 on the westerly portion of the Pacific highway, between Seattle and Tacoma. The work was done at the time stated because of the contemplated paving and improvement of the highway, and because, in view of the expected improvement of the highway, the conduit could then be laid at less cost. Evidence introduced by respondent shows that at this time there was much use of the toll facilities between Seattle and Tacoma. Manifestly, construction of underground conduits in advance of street improvements results in a great saving of expense. It appears that the installation of these conduits at the time they were placed in position constituted the exercise of sound business judgment on the part of respondent's officers. The same may be said of the other smaller amounts of conduit installed by respondent. In this connection, the Denver Union Stock Yard Co. case, supra, is also in point.
In connection with the question now under consideration, appellant cites the case of Pacific Coast Elevator Co. v.Department of Public Works, 130 Wn. 620, 228 P. 1022, *Page 230 
a proceeding initiated by the department on its own motion for the purpose of establishing reasonable charges for handling and storage of grain by the utility company, which brought before the superior court for review the order entered by the department. In establishing the rate base, the department excluded two warehouses owned by the utility which were not in use at the time of the hearing and which had not been used for the preceding five years. Both warehouses were in disrepair, although they could have been reconditioned. The evidence before the department indicated that there was no immediate prospect that the warehouses would be repaired and used, it appearing that competing plants had destroyed their value. This court affirmed the department's exclusion of these two warehouses from the rate base. Property which has been used and useful in the business of a utility, but which has apparently been abandoned and unused for five years, stands in a different position from property which has been purchased or installed for future use, all in the exercise of sound business judgment. The fact that circumstances have delayed the actual use of the property is not controlling, nor does it have as much bearing on the question as long continued abandonment of property once used.
Appellant suggests that the underground conduits installed between Seattle and Tacoma will be used to a considerable extent for the carriage of interstate service. The department, after a separation study, may properly allocate a reasonable proportion of the cost of the conduits to intrastate service.
The trial court did not err in directing that the department include in the rate base the cost of these underground conduits.
Appellant next assigns error upon paragraph numbered two of the decree entered by the superior court, supra, in which the court held that, in its determination of fair value of respondent's property, the department erred as matter of law in finding that the fair value of such property was its original cost less the amount of respondent's depreciation *Page 231 
reserve account attributable to Washington intrastate property. The court directed that the department, in determining the question of fair value, "give consideration to the cost of reproduction of such property less existing depreciation," and further directed that such existing depreciation "be determined by physical inspection, in so far as practicable, giving due consideration to other causes of retirement of property, such as inadequacy, obsolescence, changes in the art, and requirements of public authorities." The department, after a lengthy hearing, found that, in so far as the value of respondent's property, used and useful in furnishing intrastate telephone service, was concerned, the best evidence was the original cost of the property. In other words, the department, as the first step in determining the fair value of respondent's property for rate-making purposes, adopted the historical cost theory (from which cost it deducted depreciation), rather than endeavoring to estimate the reproduction cost of the property less accrued depreciation. Both of these methods have been followed by rate-making bodies throughout the United States, some preferring one, others the alternative method, some employing a combination of both. Probably in recent years the greater number have determined fair value by finding the reproduction cost and then deducting existing depreciation, giving consideration to other elements, such as obsolescence, inadequacy, changes in the art, etc.
Both systems are subject to criticism. The determination of fair value by establishing an estimate of reproduction cost less depreciation is open to the objection that, when labor and material costs are low, the net result may be unfair if the plant under consideration was constructed when such costs were high. If, on the other hand, at the period of the investigation, wages are high and materials expensive, reproduction cost of the plant may result in too high a rate base. It has happened that at one time a rate-making body (or the utility) has desired to follow one method, while at another time the rate-making body (or the utility) would prefer that the other theory be followed. *Page 232 
In the case at bar, the department to a great extent, if not entirely, accepted respondent's books as evidence of the original cost of respondent's properties. There seems to be no dispute concerning this matter. The department fixed the original cost of the intrastate property (excluding property held for future use, which matter we have considered above) at not more than $61,000,000, as of December 31, 1939, including allowance for working capital. Respondent estimated the original cost of its intrastate property as of December 31, 1938, at $60,401,536. As of December 31, 1939, respondent estimated the item of original cost at something over a million dollars more than its estimate for December 31, 1938. The department made no estimate of the cost of reproduction of respondent's intrastate property, but respondent was permitted to introduce evidence concerning such cost. Based upon this evidence, respondent estimated the cost of reproduction new of its intrastate property within this state at $59,104,770, as of December 31, 1938. Respondent then estimated the reproduction cost of the property, less existing depreciation at the date last mentioned, at $53,373,669.
In fixing the rate base, the department deducted from its estimate of the original cost of respondent's intrastate property the amount of the account on respondent's books denominated "depreciation reserve," which the department found attributable to respondent's property in this state put to intrastate use. The department in this manner determined the rate base, or fair value of respondent's intrastate property for rate-making purposes, to be not more than the sum of $42,500,000. Respondent contended that the fair value of its intrastate property for rate-making purposes (or the rate base) for the year 1940 should be fixed at $61,463,968.
It would seem that both before the department and the superior court respondent did not seriously object to the adoption by the department of the latter's valuation of respondent's property based upon the original cost (or prudent investment) theory. Respondent's contention is that, *Page 233 
if the department chose to follow this method in determining valuation, the original cost should constitute the rate base without any deduction for accrued depreciation. This system was apparently followed by the rate-making authorities of this state when such rate-making bodies were first constituted by our legislature, and until eight or ten years ago.
In this connection, the history of our statutes creating rate-making authorities should be noted.
By chapter 117, p. 571, Laws of 1911 (Rem. Rev. Stat., § 10339 [P.C. § 5528] et seq.), entitled the "Public Service Commission Law," the legislature created a public service commission, conferring upon it, inter alia, authority to regulate the operations and rates of common carriers (including telephone companies), in so far as their intrastate operations were concerned. Section 92, chapter 117, p. 601, Laws of 1911 (Rem. Rev. Stat., § 10441), which remained in effect until amended by chapter 165, p. 602, Laws of 1933 (Rem. Rev. Stat. (Sup.), § 10441 [P.C. § 5619]), established the procedure to be followed by the commission (now the department of public service of Washington) in determining valuations of the property of the utilities for rate-making purposes.
Pursuant to Rem. Rev. Stat., § 10441, the commission (which we refer to as the department), in determining a rate base, followed the original cost system, having due regard for the prudent investment principle, making no deduction for depreciation. This system was approved by this court in the case of State ex rel.Spokane Falls Gas Light Co. v. Kuykendall, 119 Wn. 107,205 P. 3, and in the later case of Pacific Coast Elevator Co. v.Department of Public Works, 130 Wn. 620, 228 P. 1022.
[14] By § 4, chapter 165, p. 604, Laws of 1933 (Rem. Rev. Stat. (Sup.), § 10441), the legislature amended Rem. Rev. Stat., § 10441, providing for ascertaining and determining the fair value for rate-making purposes of the property of any public service company used and useful for service in this state, the statute leaving the department free to use any *Page 234 
proper method in determining such valuations. Subsequent to the enactment of the 1933 amendment, in acting under authority of the section of the statute last referred to, the department, in determining valuations, has been free to follow in each case the method, or combination of methods, which seemed best fitted to accomplish the desired result and do justice both to the rate payers and to the utilities. The action of the department was approved by this court in the case of State ex rel. WinlockWater Co. v. Department of Public Works, 180 Wn. 278,39 P.2d 603, in which case we said:
"In determining the fair value of the utility for rate making purposes, it was proper for the department to consider the original cost of construction, the cost of additions and betterments, and the cost of reproduction new. These matters are to be determined in the light of the facts of the particular case."
The case of State ex rel. Oregon-Washington Water Service Co.v. Department of Public Works, 184 Wn. 451, 51 P.2d 610, is to the same effect.
In conducting the hearing in the case at bar, the department, in determining the fair value of respondent's property for rate-making purposes, possesses full authority to follow any lawful method or combination of methods which are adequate and sufficient to enable the department to fix a just valuation of respondent's properties.
In this connection, the following decisions of the supreme court of the United States are important.
In the case of Los Angeles Gas etc. Corp. v. RailroadCommission, 289 U.S. 287, 77 L.Ed. 1180, 53 S.Ct. 637, the court, referring to the setting up of a rate base on which the utility is entitled to earn a fair return, said (p. 305):
"This Court has repeatedly held that the basis of calculation is the fair value of the property, that is, that what the complainant is entitled to demand, in order that it may have `just compensation,' is `a fair return upon the reasonable value of the property at the time it is being used for the public.' In determining that basis, the criteria at hand for ascertaining market value, or what is called exchange *Page 235 
value, are not commonly available. The property is not ordinarily the subject of barter and sale and, when rates themselves are in dispute, earnings produced by rates do not afford a standard for decision. The value of the property, or rate base, must be determined under these inescapable limitations. And mindful of its distinctive function in the enforcement of constitutional rights, the Court has refused to be bound by any artificial rule or formula which changed conditions might upset. We have said that the judicial ascertainment of value for the purpose of deciding whether rates are confiscatory `is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts.'"
In the later case of Federal Power Commission v. Natural GasPipeline Co., 315 U.S. 575, 86 L.Ed. 1037, 62 S.Ct. 736, the court said (p. 586):
"The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end."
In the case of Railroad Commission v. Pacific Gas ElectricCo., 302 U.S. 388, 82 L.Ed. 319, 58 S.Ct. 334, the supreme court considered an appeal from a per curiam decree of the district court, Wilbur, circuit judge, and St. Sure and Louderback, district judges, sitting, enjoining the enforcement of an order of the commission fixing rates for the sale of gas. The opinion, written by Mr. Chief Justice Hughes, is of interest in connection with several phases of the case at bar. The rule that, in fixing the value of the property of a utility, historical cost is admissible evidence of such value, was reaffirmed. The court noted that the California commission had stated that in determining a proper rate base the commission had followed the practice of using the *Page 236 
actual or estimated historical cost of the property undepreciated, and had used the sinking fund method to determine the allowance for depreciation to be included in operating expenses. On the record before it, the supreme court stated that it concerned itself only with the question of procedural due process, and reversed the decree of the district court, remanding the cause for further proceedings in conformity with the opinion.
Upon remand, the district court, the same three judges sitting, again considered the matter, Pacific Gas Electric Co. v.Railroad Commission, 26 F. Supp. 507, the opinion, written by Judge Wilbur, having been filed September 8, 1938, and, after rehearing, February 9, 1939. Prior to the first hearing before the district court, the matter had been referred to a special master, and came before the court upon exceptions to his report. In the first decree of the district court, from which the appeal had been prosecuted to the supreme court of the United States, the district court had held that the refusal of the commission to consider any evidence relating to the cost of reproduction new of the utility's property was an arbitrary refusal to consider evidence concerning the value of the property which the supreme court had declared essential to a proper determination of the questions of value and confiscation. In the decree after remand, the district court held that, under the decisions of the supreme court, both historical cost and reproduction cost new should be considered in arriving at the fair value of the property of the utility. Concerning the matter of depreciation, the court said (p. 522):
"One of the principal difficulties in fixing just compensation for the use of the property of a public utility arises from the fact that such property continuously depreciates. To make a proper annual allowance for such depreciation and to ascertain its present value by a deduction of the annual depreciation are the two phases of the problem. It is settled that in determining the fair value of the property for rate making purposes it is essential that accrued depreciation be deducted from the cost to reproduce new in using that evidence for the determination of the present value of the property. Similarly, in using the evidence *Page 237 
of historic cost to determine present value there must be an appropriate deduction for accrued depreciation. The rate base should lie somewhere between the historic cost depreciated and the reproduction cost new depreciated."
In the case of Pacific Tel. Tel. Co. v. Whitcomb,12 F.2d 279, the United States district court for the western district of Washington, three judges sitting, reviewed recommendations of a special master upon exceptions to the master's report. This case involved the establishment of rates by the then department of public works of Washington for the respondent herein and a local subsidiary company. As stated in the opinion, the department took for the basis of the rates which it promulgated the original cost of the properties to the company. The master rejected this method, making a new estimate following, as stated by the court, the rules announced by the supreme court of the United States in the case of Smyth v.Ames, 169 U.S. 466, 42 L.Ed. 819, 18 S.Ct. 418, as explained by the later holdings of the supreme court. In his report, the special master then determined the amount of depreciation and made his finding of the fair value of respondent's property for rate-making purposes. The district court held that the method followed by the special master was correct.
In the case cited, the district court overruled the exceptions to the report of the special master rejecting the method followed by the department in determining the rate base upon which respondent's fair rate of return was to be estimated, and in all particulars approved the report of the special master, including his recommendation that the rate base be estimated upon the reproduction cost of the company's property less actual depreciation. The court enjoined enforcement of the order of the department.
It is generally considered, depending, of course, upon the nature and amount of the property of the utility, that, in determining the fair value of the property of a utility for rate-making purposes, in many cases a more accurate result may be reached by estimating the reproduction cost of the property less accrued depreciation as determined by *Page 238 
a physical examination of the property, giving due regard to obsolescence, changes in the art, requirements of public authorities, and other matters proper to be considered. This is particularly true in cases of public utilities whose property is of such a nature that its reproduction cost may be determined without very great difficulty. Notwithstanding the fact that this method may have been followed in the majority of instances, a rate-making authority is not limited to this method, but may follow any plan which results in establishing a just and reasonably accurate rate base or fair value of a utility's property for rate-making purposes. The method to be followed in accomplishing this end is a legislative, not a judicial, function, and, subject to the law, is to be determined by the rate-making body.
[15] Respondent argues that, if the rate-making authority adopts as a starting point the original cost method, no deduction should be made from the amount fixed as the original cost to cover accrued depreciation. Respondent correctly states that the fair value of a utility's property is not a certain figure less something. We do not agree, however, with respondent in its contention that, if a rate-making body proceeds by first establishing the original cost of a utility's property, that amount must be taken as the fair value thereof for rate-making purposes and that no deductions may be made therefrom to represent accrued depreciation or the present depreciated condition of the property. This factor may be considered by the rate-making authority.
In the case at bar, the department made no study for the purpose of estimating the amount of physical depreciation actually suffered by respondent's property at the time of the hearing, but, receiving and disregarding the evidence offered by respondent upon this phase of the matter, arbitrarily adopted as the measure of such depreciation the amount shown on respondent's depreciation reserve book account, allocating a portion of the total of this account to respondent's property in this state used in intrastate business *Page 239 
as the measure of the accrued depreciation of the property.
Respondent's plant is, of course, maintained in good operating condition by allocations of moneys from current revenues. Respondent annually charges, as an operating expense, an item for maintenance, and also carries an account to cover annual depreciation, the total of which account is generally referred to as the depreciation reserve. The portion of current revenues allocated by respondent to this latter account is from time to time invested in the company's plants. Moneys allocated to the maintenance account are also expended in keeping the plants in good operating condition.
In the case of Lindheimer v. Illinois Bell Tel. Co.,292 U.S. 151, 78 L.Ed. 1182, 54 S.Ct. 658, the supreme court of the United States, in a comprehensive opinion written by Mr. Chief Justice Hughes, discussed the matter of depreciation of telephone property and the method of accounting used by the telephone company which was a party to the case cited, and considered at length the matter of the depreciation of the company's physical properties. In the course of the opinion, the court said (p. 167):
"Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Annual depreciation is the loss which takes place in a year."
The opinion then proceeds to discuss at length the "Reserve for Accrued Depreciation." The case is of great interest, but is not here controlling.
In the case of New York Tel. Co. v. Prendergast, 300 Fed. 822, it was held that the depreciation reserve, being merely a matter of bookkeeping, and for other reasons clearly stated, was not a proper yardstick by which to measure the depreciation of the property of a telephone company at a given time for the purpose of establishing the value of the company's property for rate-making purposes, and that the *Page 240 
depreciation suffered by the property should be ascertained by the rate-making body from opinion evidence based upon contemporary investigation.
In the later case of New York Tel. Co. v. Prendergast,36 F.2d 54, decided November 7, 1929, the earlier case between the same parties was discussed. In regard to the matter of depreciation, the court stated that (p. 65):
"In finding depreciation to be deductible from both the reproduction cost and the book value, the master correctly stated the rule to be that the sum to be deducted must be the actual depreciation."
The court then discussed the matter of "reserve depreciation," as set up by the telephone company, and held that the record indicated that the actual existing depreciation in the company's property was more accurately reflected by the amount of its reserve for depreciation than by the evidence of the expert witnesses who testified concerning actual observed depreciation. The court held that the company, without clearly showing that the actual depreciation was less than the proportion of the depreciation reserve attributable to its intrastate property, could not object to the taking of the appropriate proportion of its depreciation reserve as the measure of existing depreciation. The court, while recognizing the correct rule as above stated, because of the state of the record in the case, applied a different rule.
Several other cases in which the same procedure was followed are cited and relied on by appellant.
Appellant strongly relies upon the opinion of Honorable Charles E. Hughes, as referee, in the case of Brooklyn Borough Gas Co.v. Public Service Commission, reported in P.U.R. 1918F, 335. This was a proceeding in equity, the plaintiff seeking to enjoin the enforcement of the provisions of three statutes of the state of New York and an order of the New York public service commission, first district. The case was heard by the referee upon a reference to hear and determine. In connection with the determination of the fair value of the utility's property for rate-making *Page 241 
purposes, the commission, in March, 1913, determined the cost of reproduction of the utility's property, deducted depreciation, added the value of the utility's real estate, made allowances for preliminary and development and working capital, with the result of a total valuation in the sum of something over $1,300,000. Upon this basis, the commission fixed a rate of ninety-five cents per thousand cubic feet of gas. Subsequent proceedings before the commission resulted in the action in which the foregoing reference was made. The referee's report was filed July 24, 1918, the referee observing that it would not be reasonable to establish a rate base upon the actual cost of reproduction during the war years, because the cost of reproduction would then be abnormal. Concerning the matter of depreciation, the referee stated: "It should be observed that there is no controversy as to the propriety of the deduction for accrued depreciation," stating further:
"There is no evidence whatever to impugn the correctness of this estimate of the accrued depreciation or of the propriety of the annual additions to the depreciation reserve, or the correctness of the total estimate of accrued depreciation represented by the account known as `Accrued Amortization of Capital' as it stood on December 31, 1917."
The depreciation was fixed in an amount equal to the company's depreciation reserve account.
In the case cited, it may be noted that December 31, 1917, the utility's total fixed capital net investment was approximately $1,570,000, and its depreciation fund nearly $337,000. It appears from the referee's report that the amount deducted for accrued depreciation involved no particular controversy. Under these circumstances, the action of the distinguished jurist who acted as referee in the matter affords no strong support to appellant's contention here, that in the case at bar the depreciation reserve should be the proper measure of the depreciation of respondent's property.
In the case of West v. Chesapeake Potomac Tel. Co.,295 U.S. 662, 79 L.Ed. 1640, 55 S.Ct. 894, decided June 3, 1935, the supreme court reviewed a decree of the district court enjoining, at the utility's suit, an order of the public *Page 242 
service commission of Maryland directing the utility to effect certain reductions in its rates. The commission had taken the value of the utility's physical plant in 1923 (exclusive of the then depreciation reserve), amounting to something over $35,000,000, and trended it to approximately $23,600,000, as of 1932. After further computations set forth in the opinion of the supreme court, the commission arrived at a basis which the supreme court criticized as inappropriate for obtaining the value of a going telephone plant. The district court held that the method followed by the commission was inapt and improper, and the supreme court agreed with the district court in this particular. It appears that the district court, after condemning the method followed by the commission, adopted a method of its own, which consisted in deducting the company's depreciation reserve from book cost and adding to the difference an allowance for working capital. Concerning the method followed by the district court, the supreme court said (p. 679):
"The opinion in essence consists of the conclusion that, all the circumstances considered, it will be fair to appraise the property at cost less depreciation reserve. This rough and ready approximation of value is as arbitrary as that of the Commission, for it is unsupported by findings based upon evidence.
"Third. For the reasons stated we cannot sustain the District Court's valuation. We have shown that the Commission's order violates the principle of due process, as the measure of value adopted is inadmissible. It is not our function, and was not the function of the court below, to do the work of the Commission by determining a rate base upon correct principles. The District Court, upon finding that the Commission reached its conclusions as to fair value from data which furnished no legal support, should have enjoined enforcement of the rate order. The court's action was therefore right, regardless of the method it pursued in reaching the decision that the order was confiscatory."
As stated in the portion of the opinion quoted, the decree of the district court enjoining enforcement of the order of the commission was affirmed, but the supreme court clearly denounced the method adopted by the trial court, as arbitrary. *Page 243 
It is proper to note that Mr. Chief Justice Hughes, whose opinion as referee above referred to is relied upon by appellant, concurred in the opinion of the supreme court in the West case. The case cited is very decidedly in point upon the question now under discussion.
Counsel for the respective parties have cited many authorities in support of their respective contentions. Rate-fixing bodies have adopted interesting and finespun theories by which it has been contended that questions concerning the amount of depreciation in large utility plants should be determined, and the utilities themselves have countered with other theories, in support of which they have argued vigorously. Study of the authorities can only lead the writer of an opinion determining such questions to agree with Mr. Chief Justice Stone, who, in his dissent in the case of West v. Chesapeake Potomac Tel. Co.,supra, said:
"In assuming the task of determining judicially the present fair replacement value of the vast properties of public utilities, courts have been projected into the most speculative undertaking imposed upon them in the entire history of English jurisprudence."
This and other portions of the majority and minority opinions in the case cited were quoted by the supreme court of Wisconsin in the case of Wisconsin Tel. Co. v. Public Service Commission,232 Wis. 274, 287 N.W. 122.
Assuming that the department was entirely correct in its contention before the superior court that the burden of proof to establish the actual accrued depreciation existing in its property rested upon respondent, and assuming that the department was justified in refusing to adopt the estimate of depreciation to which respondent's witnesses testified, nevertheless, in arbitrarily adopting as the amount of existing or accrued depreciation a certain proportion of respondent's depreciation reserve book account, appellant proceeded upon a fundamentally wrong basis and acted arbitrarily and without warrant of law. Appellant department had the right to require further evidence in connection with the matter of depreciation, or to *Page 244 
make its own investigation and study, and upon the record before us, in acting as it did, proceeded arbitrarily and beyond its statutory authority.
The trial court correctly held that appellant, in determining the fair value of respondent's property, erred as matter of law in finding that the fair value of the property was its original cost less an amount equal to a proportion of the depreciation reserve account. Paragraph numbered two of the decree appealed from will, however, be modified by changing the last two sentences thereof to read as follows:
In determining the fair value of relator's property, thedepartment may consider the original cost of the property,whether or not the cost was prudently expended, the cost ofreproduction of such property based upon such cost at normaltimes and under normal conditions, and shall then determine thepresent condition of the property in the light of existingdepreciation. In determining the amount of existing depreciation,the department may consider the condition of the property asevidenced by physical inspection thereof, in so far aspracticable, and shall give due consideration to obsolescence,inadequacy, changes in the art, requirements of publicauthorities, or other pertinent matters. The department may also,in determining the amount of existing depreciation, considerother matters which, under the rules of law, are entitled toweight in determining such a question.
It is our intention to leave the department, in establishing the rate base, free to follow any method or combination of methods warranted by law.
Appellant next assigns error upon that portion of the decree of the trial court declaring that the department erred in disallowing the license fees paid by the respondent to the American Telephone Telegraph Company, under the license contract between respondent and the American Company, and charged by the latter to respondent's operations within this state.
The American Telephone Telegraph Company, herein referred to as the American Company, owns all or a majority *Page 245 
of the common stock of fifteen subordinate operating companies, including respondent, and holds a minority interest in three other operating companies. December 31, 1938, the American Company owned 78.17 per cent of the preferred stock of respondent, and 85.80 per cent of its common stock. The department received in evidence a so-called "license contract" between the American Company and respondent, whereby the American Company agreed to maintain a staff of experts to engage in basic research work, investigation, and experimentation in the development of the art and science of telephony and in the development of plans, methods, and systems designed to improve telephone service and to promote safety, economy, and efficiency in the equipment and operation of respondent and affiliated companies. The contract also provided that the American Company would grant to the operating companies rights under all of its patents; that it would protect these companies against suits based upon alleged patent infringements; and would give the operating companies advice and assistance in engineering, accounting, legal, financial, and other problems.
It appears that the engineering and research services performed by the American Company pursuant to this contract are accomplished by Bell Telephone Laboratories and by the American Company's department of operation and engineering. Bell Telephone Laboratories is a corporation, half of its stock being owned by the American Company, and half by Western Electric Company. This latter corporation operates as the manufacturing and purchasing agent for respondent and other associated companies, and is owned by and is a subsidiary of the American Company. Evidence introduced by respondent is to the effect that the expense of Bell Laboratories incurred for research during 1938 was approximately $21,000,000, and that this expense was charged to the American Company and Western Electric Company, or a subsidiary of the latter.
There was also introduced in evidence a contract between Western Electric Company and respondent, similar contracts existing between Western Electric and other associated *Page 246 
companies, these contracts being the method whereby the American Company fulfills a portion of its obligations contained in the license contract. By these contracts, Western Electric obligates itself to sell to respondent and associated companies, at uniform and reasonable prices, required material and equipment. The associated companies are not obligated to purchase such supplies from Western Electric.
For the services rendered by the American Company to respondent and the affiliated companies, these companies agreed to pay the American Company two and one-half per cent of their gross revenues. It appeared, however, that the American Company was collecting from respondent and the other companies, pursuant to this contract, no more than one and one-half per cent of the gross revenues.
By Rem. Rev. Stat. (Sup.), §§ 10440-1 to 10440-9 [P.C. §§ 4709-51 to 4709-59], inclusive, authority is conferred upon the department to supervise contracts between affiliated interests such as the American Company and the respondent, and respondent does not deny that the contract referred to is subject to examination and scrutiny by the department pursuant to the statute referred to. In brief, the statutory provisions confer upon the department authority to investigate fully and study such contracts, and to approve or disapprove the same in so far as the rates charged by any public service company operating within this state shall become the subject of investigation and regulation by the department, which shall have continuing supervisory control over the terms and conditions of such contracts, and may forbid the making of any payments thereunder by any public service company under the department's jurisdiction.
The sections of the statute referred to also provide that the burden of proving the reasonableness of payments by a public utility operating in this state to an affiliated interest is placed upon the utility desiring to make such payment, § 10440-3 [P.C. § 4709-53] further providing that the department shall disallow such payment or compensation in *Page 247 
whole or in part, in the absence of satisfactory proof that it is reasonable in amount. The statute further provides that
"In such proceeding any payment or compensation may be disapproved or disallowed by the department, in whole or in part, unless satisfactory proof is submitted to the department of the cost to the affiliated interest of rendering the service or furnishing the property or service above described."
The department, by paragraph ten of its July order, disallowed the payments made by respondents to the American Company under its license contract as operating expenses for the year 1939, and the estimates for the year 1940, and by its October order held that respondent had "utterly failed to sustain the burden of proving the applicability of license costs to public utility operations in the state of Washington," and that such costs should be eliminated from respondent's reported operating expenses. The department also stated that it accorded appropriate consideration "to license contract services and costs in ascertaining the rate of return which would be reasonable" for respondent in the state of Washington.
In its July order, the department recognized in the license contract and the operations conducted thereunder "a mechanism of importance and frequently of much value to the Bell subsidiaries." Respondent introduced evidence tending to show that for the year 1938 the cost of rendering the license service to all licensee companies amounted to over $20,500,000; that the portion of this expense allocated to respondent's business conducted in the state of Washington was $317,457; and that respondent charged, pursuant to the license contract, as an operating expense for its business conducted in the state of Washington, the sum of $206,493. Respondent argues that payments under the license contract should be allowed as proper operating expenses.
In the case of Smith v. Illinois Bell Tel. Co., 282 U.S. 133,75 L.Ed. 255, 51 S.Ct. 65, the court considered at length the same license contract here in question. The case *Page 248 
reached the supreme court on appeal from a decree of the district court of three judges which had enjoined the enforcement of an order of the Illinois commerce commission reducing telephone rates. The state rate-making authority had allowed as operating expense a certain proportion of the payments made by the Illinois company under the license contract, the company contending that the allowance should have been in a greater amount. Referring to the license contract, the court, speaking through Mr. Chief Justice Hughes, said (p. 157):
"In view of the findings, both of the state commissions and of the court, we see no reason to doubt that valuable services were rendered by the American Company, but there should be specific findings by the statutory court with regard to the cost of these services to the American Company and the reasonable amount which should be allocated in this respect to the operating expenses of the intrastate business of the Illinois Company in the years covered by the decree."
Many other questions were considered by the court, and the decree was set aside and the cause remanded to the statutory district court composed of three judges, for further proceedings. Upon remand, the matter was again considered by the district court (Illinois Bell Tel. Co. v. Gilbert, 3 F. Supp. 595), which made findings as directed by the supreme court, taking the amounts found to be the costs to the American Company of services rendered under the license contract, and allowing as operating expenses of the local company the amount found to be the cost to the American Company, unless the amount for any given year was larger than the amount charged on the books of the company, in which case the latter amount was allowed as operating expense. Clearly, the supreme court, the district court, and the commission, all were of the opinion that services rendered by the American Company to its subsidiaries were of value, and that a certain proportion of the payment called for by the license contract should properly be charged by the subsidiary as operating expense.
[16] It is, of course, true that, in contracts between the *Page 249 
parent company and its subsidiaries, the parties are not dealing at arm's length, and that such contracts call for close scrutiny by the state rate-making authority acting pursuant to a statute such as ours, whenever the reasonableness of the terms of the contract is the subject of inquiry. Western Distributing Co.v. Public Service Commission, 285 U.S. 119, 76 L.Ed. 655,52 S.Ct. 283; American Tel. Tel. Co. v. United States,299 U.S. 232, 81 L.Ed. 142, 57 S.Ct. 170; Natural Gas Pipeline Co. v.Slattery, 302 U.S. 300, 82 L.Ed. 276, 58 S.Ct. 199.
Appellant department found that the license contract was a device employed by the American Company to maintain complete control of respondent and other subsidiary companies, and that from the evidence introduced it was impossible to ascertain the duties performed by those employees whose wages and expenses were charged in connection with the research and other matters connected with the services performed under direction of the American Company. The department was also of the opinion that no definite connection was shown between the service rendered and respondent's state of Washington operations. The record in the case at bar shows beyond question that, as stated by the supreme court in the case of Smith v. Illinois Bell Tel. Co., supra, there is no reason to doubt that services valuable to respondent and other subsidiary companies are rendered pursuant to the license contract. It would be impossible for each subsidiary corporation itself to maintain a laboratory and a staff of experts to render such service. The facts that the work is done by a central agency, and that the precise allocation of benefit on the one hand and cost on the other, cannot be apportioned among the respective subsidiaries with mathematical precision, are no good reason for the refusal of a state regulatory authority to refuse to allow a utility under its jurisdiction to contribute, as part of its operating expense, a fair proportion of the cost of maintaining the service.
In the case of Wichita Gas Co. v. Public Service Commission,2 F. Supp. 792 (affirmed 290 U.S. 561), the United *Page 250 
States district court, three judges sitting, held that the public service commission of Kansas, acting under authority of a statute similar to that of this state, was authorized to inquire concerning contracts between a parent company and its subsidiary. The court also held that, while the findings of the regulatory body are presumed to be correct on the question of confiscation, the utility is entitled to the independent judgment of a judicial tribunal both as to the law and the facts. In the case cited, the utility was engaged in distributing gas, being one of several subsidiary companies similarly engaged. These subsidiaries had entered into a contract with the parent company, agreeing to pay that company a management fee equal to one and three-fourths per cent of its gross revenues, after certain deductions, and an engineering fee equal to five per cent of certain construction costs. The state authority approved the latter payment, but disallowed the management fee as an operating expense. The Federal statutory court, while finding that a certain proportion of the payments called for by the contract would be proper, refused to interfere with the ruling of the commission in connection with the matter referred to, because from the record it appeared that the parent company, in addition to rendering services to each subsidiary distributing company, engaged in other activities of no value to the subsidiaries, the record showing the cost of all its activities, and showing no allocation of any part of the total expense incurred for the benefit of the subsidiary.
In the case of Arkansas-Louisiana Gas Co. v. Texarkana,17 F. Supp. 447 (affirmed 96 F.2d 179), the district court, considering the same contract which was the subject matter of the litigation in the case last cited, held that the master to whom the case had been referred had erred in reversing the order of the state regulatory authority disallowing payments made on account of the management fee as an operating expense. The court observed that, while the service rendered by the parent company had been recognized by the authorities as a proper allowance for operating *Page 251 
expenses, such an allowance must be supported by substantial evidence showing that the service called for by the contracts was of value to the subsidiary commensurate with the price paid, and that such price is fair and does not exceed the actual cost of rendering the service. The court observed that the utility made no effort to justify the expense, beyond contending that it was not a subsidiary of the parent company. The court held that the burden resting upon the subsidiary to justify the allowance of the payments as operating expense had not been met.
Appellant relies upon the case of Solar Electric Co. v.Pennsylvania Public Utility Commission, 137 Pa. Super. 325,9 A.2d 447, in which the superior court of Pennsylvania reviewed an order of the public utility commission fixing rates to be charged by the utility. Among the many questions considered by the court was the matter of payment by the utility to affiliated companies for alleged services rendered. The commission refused to allow certain payments as operating expenses, and the court affirmed the commission's ruling, the record containing no sufficient evidence as to the value, necessity, or benefit to the utility of the services rendered by the affiliated companies. The court called attention to the fact that the commission recognized that the utility did receive some service of value from its affiliates, and that in its brief the commission stated "if appellant would properly support the charges, the commission would allow them."
[17] Beyond question, the services rendered by the American Company under the license contract are of value to its subsidiaries, including respondent. The record in the case at bar amply supports a finding to this effect, and does not support the order of the department.
By the decree appealed from, the trial court declared that the department erred in disallowing license fees paid by respondent to the American Company under the license contract above referred to, as a portion of respondent's operating expense. The court then declared that disallowance of such payment was erroneous as a matter of law, and *Page 252 
that all such charges should be included as necessary operating expenses.
We agree with the trial court that, in disallowing all payments under the license contract, the department acted arbitrarily, and as matter of law committed error. We do not, however, hold that the department must approve respondent's agreement to pay to the American Company one and one-half per cent of its gross revenue. The department will again consider this matter, and allow all or such portion of the payment called for by the license contract as may, from the record made, or after further investigation, if desired, appear to the department to be reasonable and proper.
Appellant next assigns error upon that portion of the decree appealed from by which the court reversed the order of the department in so far as it disallowed payments made by respondent to a trustee under respondent's pension plan to provide for the cost of pensions to respondent's employees.
It appears that, during the year 1913, the American Company adopted a plan providing for the payment of pensions to its employees upon retirement. The pension fund consists solely of moneys placed in the fund by respondent, the employees making no contributions whatsoever. No employee obtains any right to payments under the plan until he has reached the age of sixty years and has been continuously employed by respondent or any affiliated company for twenty years, or under some other provisions of the plan has been placed upon the pension roll. Other classes of employees may receive pensions at the discretion of respondent. Except as to employees who have, under the plan, become entitled to payments thereunder, the amount of pensions to be paid may be increased or diminished at the direction of the American Company.
In its order, appellant stressed the control of that company over the pension plan and the resulting control over the employees which the company maintains, and noted the fact that, under the Federal social security acts (42 U.S. *Page 253 
C.A. § 401 et seq.), the employees of respondent and affiliated companies were adequately provided for. The department also found that payments under the Federal acts, plus payments under the American Company's private pension plan, were exorbitant and unreasonable, and that the cost of the latter plan to the telephone rate payers in this state, if charged to respondent's operating expenses, was unjustified. The department also stressed the fact that the rate payers are obliged to contribute through taxation to the state senior citizens' relief, and that to charge respondent's contributions to the American Company's private pension plan, as operating expense, placed an unreasonable burden upon the rate payers.
It should be noted that the American Company established its pension plan thirty years ago, long prior to the enactment of Federal or state statutes providing for payments to persons reaching certain specified ages. It has long been recognized that age impairs the efficiency of all workers, whether those engaged in manual labor or working at desks. At the same time, an employer who discharges its employees because of impaired efficiency due to age or other causes, suffers severe criticism from the fellow employees of those who are discharged, and to some extent from the public at large, because of its apparent callous disregard of the welfare of those who have served long and faithfully.
The pension plan referred to is in effect in all American Company's subsidiaries. If that portion of the order of the department now under discussion be affirmed, manifestly either respondent's employees in this state would be deprived of benefits under the pension plan, or, as to them, the pension fund would be supported from revenues received by the American Company from other jurisdictions, or from respondent's net return from this jurisdiction, or from the net return to the American Company.
All contributions to the pension fund made by respondent and associated companies to the trustee of the pension fund are irrevocable payments, and that fund must be used *Page 254 
solely to pay pensions to employees. The plan applies uniformly to all of respondent's employees, regardless of duties or salary level. The amount of pension payable to an employee upon retirement amounts to one per cent of his average pay during the ten years preceding retirement, multiplied by the number of years of his service. According to an actuarial study, respondent makes periodic payments to the trustee in such amounts that a fund adequate to pay anticipated pensions will accumulate.
There can be no question but that as a general proposition such a pension plan as that under discussion is desirable, and is beneficial to the utility, to its employees, and to all concerned. The pension plan was, of course, much more beneficial and important at the time it was initiated than it is now. Appellant department recognizes the advantages of a pension plan, and apparently admits that, save as to the question of supposed double payments under Federal and state statutes, amounts contributed by respondent to the pension fund should be allowed as operating expense, if the payments are reasonable and the plan provides for no more than a proper discretionary control to be exercised by the utility over the pension system.
In this connection, it must be remembered that the American Company set up this pension plan twenty years prior to the time that the Federal government provided by statute for the existing social security system.
In connection with this matter, the following quotation from the opinion in the case of State v. Tri-State Tel. Tel. Co.,204 Minn. 516, 284 N.W. 294, is of interest:
"We do not consider it amiss however to say that the payment of pensions to superannuated employees is not only in accord with accepted sociological views but is also of definite, though indirect, economic benefit to the subscribers. Within limits, expenditures for this purpose should be treated as an expense. In deciding whether a specific claim for allowance for payments for such purposes should be granted, the commission must necessarily give due consideration to the discretion exercised by the management in establishing a pension system. If the amounts are reasonable and are actually paid as pensions, or are allocated *Page 255 
to a fund in pursuance of a feasible plan whereby it is assured that the sums so allocated will be used to pay pensions in reasonable amounts, allowance should be made."
In the case cited, it appeared that the rate-making authority of the state of Minnesota refused to allow payment of contributions to the pension fund as an operating expense of the utility. On appeal to the district court, the commission's order was affirmed, and the supreme court of Minnesota, in its decision on appeal from the decree of the district court, did not reverse the commission's refusal to allow contributions to the pension fund as operating expenses, the supreme court being of the opinion that the rate of return established by the commission would not be confiscatory, notwithstanding the refusal of the commission to allow pension contributions to be charged as operating expenses.
Apparently appellant takes the position that, in view of the existing Federal social security statute, a private pension plan such as that under discussion is unnecessary. It cannot be held that the managing directors of respondent acted arbitrarily or abused their discretion as directors in not terminating the pension plan when the Federal act became effective. A different question would be presented had the pension plan been initiated after the enactment of the Federal law. Certainly the objective originally in view when the private pension plan was established would still be important, and the continuation of the private pension plan would have an important bearing upon maintaining an efficient, interested, and loyal group of employees. Had the pension plan been terminated when the Federal social security statute became effective, certainly the effect upon the employees who had been working under the pension plan for twenty years would have been disconcerting, to say the least.
Persons within the scope of the Federal act pay through deductions from their wages half of the moneys collected under the act. For this pro rata portion of the benefits they may receive, the employees pay in the same sense (save *Page 256 
that the payment is compulsory) that they pay for endowment, accident, or health insurance, written by private companies. Certainly an employer maintaining a private pension system should not refuse the benefits of that system to an employee who may in addition carry insurance written by a private company, by the terms of which he will receive an annuity after reaching a certain age.
The evidence introduced by respondent shows that, after the Federal social security act became effective, its pension plan was amended by reducing by one-half of the primary insurance benefit which the employee would receive from the Federal government the pension to be paid by respondent to each of its employees. This reduction in the amount of the pensions which respondent formerly paid its employees represents the amount of pensions for which respondent pays in taxes to the government. The result of this arrangement is that respondent contributes a lesser amount to its own private pension fund, making these payments to the Federal government by way of special taxes, the government then paying to those employees who go on the pension roll the pensions paid for, one-half by the pensioner and the other half by respondent.
At least the majority of the employees of respondent who receive a pension from respondent receive also a certain payment from the government, for one-half of which they have themselves paid, respondent having paid by special taxes for the other half, and in addition receive from respondent the amount payable under the private pension plan. The department was evidently of the opinion that in some manner the present system would, if the payments made by respondent are included in operating expenses, result in a larger amount being so charged than would have been charged under respondent's private pension plan, were there no Federal social security act. It would seem clear that the portions of the employees' salaries paid to the Federal government under the statute cannot be charged as any part of respondent's operating costs. If the aggregate of the payments made by respondent out of its revenues to *Page 257 
the Federal government on the one hand, and to its own private pension fund on the other, approximates the same amount that respondent would have paid into its own private pension fund had no Federal social security come into existence, the fact that the two systems exist side by side would cause little increase in respondent's operating costs.
A witness called by appellant criticized respondent's pension plan from the standpoint of the Washington rate payers, by stating that actuarial rates developed from the experience of all the affiliated telephone companies might not be applicable to respondent's employees in the state of Washington. We are not impressed by this suggestion. Possibly there might be some small variation in actuarial estimates as affecting telephone employees in different parts of the United States, but it would seem that such possible variation would not justify the expense and trouble necessary to set up different rates for each portion of the country.
Appellant's argument that none of the payments made by respondent under its pension plan should be allowed as operating expense, for the reason that, under the two pension systems referred to, respondent's employees will receive excessive or double pensions, is without merit.
In the case of Consolidated Gas Co. v. Newton, 267 Fed. 231, the United States district court, in a suit in equity, reviewed an order of the public service commission of the state of New York, first district, by which the commission had imposed on the plaintiff, inter alia, a limitation of eighty cents as the rate which plaintiff might charge to consumers of its product. A master having been appointed, the matter came before the court upon exceptions to his report. The master had allowed as an operating expense certain pension payments made by the company under a system which it had set up, whereby its employees when sick received benefits and when reaching certain ages received pensions. It appeared that the master had assumed that the discretion of the officers of the corporation was not subject to review. The court held that the master, in making this assumption, *Page 258 
had erred, "because if that discretion had been wanton or extravagant beyond reason, it could not stand." The court held that the master's ruling constituted error without prejudice, and that the master had properly ruled that the payments made by the company by way of benefits or pensions constituted proper charges against operating expense. In connection with this matter, the court said (p. 254):
"Mutual Aid Society and Superannuation. Under these two items are charged those payments, now very common among large corporations, by which the employes receive insurance for sickness or distress or a pension when aged. There can be no question of their propriety in substance, nor can I, with deference, agree with Kings County Lighting Co. v. Lewis,110 Misc. Rep. 204, 230, 180 N.Y. Supp. 570, that the charges may not be made during the years when the disability existed. The method to be adopted is fairly open to the discretion of the officers, and in the end it makes very little difference how it is distributed among consumers. The question is whether it is in fact paid and represents a reasonable amount."
In the case of Chesapeake Potomac Tel. Co. v. PublicUtilities Commission, 62 Wn. Law Rep. 486, Mr. Justice Adkins, of the supreme court of the District of Columbia, referring to the matter of the telephone company's pension reserve, said:
"Pension reserve. In its original opinion the Commission approved a pension reserve but suggested the amount being charged thereto `be somewhat decreased at least for the next twelve months and that the accrual need not be greater than $100,000.' In its second opinion the Commission found `that for the purpose of this case the charges against income for pension reserve are not properly to be considered in determining net telephone revenues or the reasonableness of rates, tolls and charges to be made to the public.'
"In many states there are today statutes providing for old age pensions. Pension systems are common in large corporations. In my judgment plaintiff's system is proper and the amount being annually set aside is ascertained by proper methods.
"The entire amount of the accrual is properly to be considered in determining the net telephone revenues and the reasonableness of the charges made to the public." *Page 259 
In the case at bar, it appears that, when respondent first set up its pension system, it was operated on a "pay as you go" plan, and that, in 1928, the company changed this system, adopting an accrual plan of payment based upon actuarial tables and studies. Appellant argues that, under this system, a charge was imposed upon present rate payers to make up a deficiency in the pension fund which existed prior to 1928, and that the change in plan violated the principle that past losses cannot be recovered from present or future rate payers. Appellant suggests that, under the present system, the rate payers are contributing to the existing unfunded actuarial reserve, because many of respondent's employees were so employed prior to 1928, and for the basis of computing their retirement pay, that service is considered.
Difficulties are always experienced, whether by governmental agencies or private businesses, in setting up new spheres of operation of established governmental agencies or private businesses. If a change is to be made, a new system must have a beginning, and if a system is to be terminated, it must have an end. Save in so far as basic legal principles or definite rights of individuals or groups are violated, the law does not arbitrarily forbid change, nor does it control the future by establishing the past or the present as an immutable mold from which patterns must be taken for future years. State ex rel.Oregon R. N. Co. v. Railroad Commission, 52 Wn. 17,100 P. 179.
In connection with the change of system inaugurated by respondent in 1928, we find nothing which places an illegal burden upon present rate payers.
[18] As courts have often stated, phe officers responsible for the conduct of a business exercise a broad discretion in directing and controlling the operations thereof. In the absence of any showing that such officers have abused their discretion or acted arbitrarily, illegally, or beyond their lawful authority, courts will seldom interfere in the financial arrangements or methods of management of a business. State ex rel. SouthwesternBell Tel. Co. v. Public Service *Page 260 Commission, 262 U.S. 276, 67 L.Ed. 981, 43 S.Ct. 544, 31 A.L.R. 807; Northwestern Bell Tel. Co. v. Spillman, 6 F.2d 663;Havre de Grace Perryville Bridge Co. v. Towers, 132 Md. 16,103 A. 319; Monroe Gaslight Fuel Co. v. Michigan PublicUtilities Commission, 11 F.2d 319; Brooklyn Borough Gas Co.v. Prendergast, 16 F.2d 615.
[19] We are not impressed by appellant's argument that respondent's pension system constitutes an unfair method of control over its employees. It seems clear that respondent established the system for the purpose of creating and maintaining efficiency and attention to duty among its employees, as well as for the purpose of attracting able and intelligent men and women to its employment. The record contains no evidence tending to show that respondent has ever acted in bad faith in administering its pension plan, and certainly nothing that respondent could do would have a greater tendency to bring about indifference and bad feeling among its employees than manifestation of an intention to administer unfairly its pension system, or to use the same as a coercive weapon to force its employees to adhere to obnoxious or unwelcome methods to be followed in the course of their employment.
We make this ruling, as we make others, upon the record before us. If at some future time the department is called upon to reconsider the question of pensions, and the evidence discloses a different state of facts, the department will be free to reexamine the matter.
The trial court did not err in reversing that portion of the order of the department disallowing as operating expense payments made by respondent to the trustee under respondent's pension plan, to provide for the cost of pensions.
Finally, appellant assigns error upon that portion of the decree in which the trial court declared that appellant erred in fixing at five per cent the rate of return which respondent is entitled to receive on the fair value of its property, and held that "as a matter of law and fact, a fair return upon such fair value is not less than six per cent." In its October order, appellant considered at considerable length the *Page 261 
matter of the rate of return to be allowed respondent, and found that such a rate fixed at four and one-half per cent on the rate base established by the department would produce a fair, reasonable, and adequate return to respondent. The department, however, stated that, in order to allow for possible contingencies, it established five per cent as the rate of return which respondent should earn upon the fair value of its property.
In reaching its determination that respondent's rate of return should be fixed at five per cent, the department considered the following factors: general economic conditions; ability to attract capital; current cost of money; the financial history of respondent; the risk involved in carrying on its operations; the comparison between respondent's business and other enterprises; and the general efficiency of the management of respondent's business. The department properly gave consideration to the factor of risk, or the absence thereof, in the carrying on of respondent's business, which is an element that should always be considered.
By Rem. Rev. Stat., § 10391 [P.C. § 5582], it is provided that when the department, after a hearing, finds that rates charged by a telephone company are
". . . unreasonable, unjustly discriminatory or unduly preferential, or in any wise in violation of law, or that such rates, charges, tolls or rentals are insufficient to yield reasonable compensation for the service rendered, the commission shall determine the just and reasonable rates, charges, tolls or rentals to be thereafter observed and in force, and fix the same by order as hereinafter provided."
[20] Upon judicial review of orders of the department such as those now before us, which include the fixing of a rate of return on the fair value of its property to be received by the utility, the question to be determined is whether or not the order of the regulating authority is confiscatory. Los Angeles Gas etc. Corp.v. Railroad Commission, 289 U.S. 287, 77 L.Ed. 1180,53 S.Ct. 637; Railroad Commission v. Pacific Gas Electric Co.,302 U.S. 388, 82 L.Ed. 319, 58 S.Ct. 334.
In the case of Columbus Gas Fuel Co. v. Public Utilities *Page 262 Commission, 292 U.S. 398, 414, 78 L.Ed. 1327, 54 S.Ct. 763, 91 A.L.R. 1403, concerning rates fixed for sale of gas, the court said:
"In so far as a reasonable rate is something other or higher than one not strictly confiscatory (Banton v. Belt Line Ry.Corp., 268 U.S. 413, 423), the difference, if any, is determined with finality by the appointed officers of the state."
In the case of Federal Power Commission v. Natural GasPipeline Co., 315 U.S. 575, 86 L.Ed. 1037, 62 S.Ct. 736, the court reviewed, by way of certiorari, a judgment of the circuit court of appeals for the seventh circuit, vacating an order of the Federal power commission fixing rates to be charged by the utility for the sale of natural gas. Many questions were considered by the court, among them the contention of the utility that the commission, in fixing six and one-half per cent as a fair annual rate of return upon the rate base allowed, erred in not fixing a higher rate. In the course of its discussion of the phase of the case referred to, the court said (p. 596):
"Courts are required to accept the Commission's findings if they are supported by substantial evidence. § 19(b). We cannot say, on this record, that the Commission was bound to allow a higher rate."
The court discussed certain evidence in the record showing the decline in the profits earned by industrial, utility, and railroad corporations from the year 1929 to the year 1938, also calling attention to the low interest rates prevailing on all forms of investment. The utility whose rates were the subject of the order before the court for review was engaged in the business of selling natural gas, and the opinion called attention to the fact that the matter of the estimated life of the gas field had been taken into consideration, with provision for the complete amortization of the investment. While on the phase of the case referred to the supreme court was concerned only with the question of whether or not the commission was bound to allow a higher rate of return than six and one-half per cent, the *Page 263 
court's discussion of the question is of interest in connection with the phase of the case at bar now under consideration.
It is proper to observe here, in connection with this question, that a considerable proportion of the decided cases in which orders fixing rates of return were considered are of less assistance than usual, as a decision that a rate fixed by the regulatory authority at seven per cent is not confiscatory does not, as a rule, give any indication as to the lower rate which should be held unlawful.
The matter of the rate of return is also a question which varies greatly with changing economic conditions. As the courts have repeatedly said, a rate which might be proper at one time might well be too high or too low at a subsequent date.
In the case of Peoples Gas Light etc. Co. v. Slattery,373 Ill. 31, 25 N.E.2d 482, in which the question now under discussion was considered, the supreme court of Illinois used the following language (p. 68):
"The question presented in this record is whether a net return of five per cent constitutes confiscation or, in other words, deprives the company of its property without due process of law, and this is a different question than determining a just and reasonable return upon property used and useful in the utility business. It has been held that a reasonable rate is something other or higher than one not strictly confiscatory, the difference, if any, being determined with finality by the appointed officers of the state."
In the case of Southern Bell Tel. Tel. Co. v. LouisianaPublic Service Commission, 187 La. 137, 174 So. 180 (decided 1937), the supreme court of Louisiana considered a question similar to that now under discussion. In its order, the state commission had stated that the utility was entitled to a return of six per cent, estimating that the rates fixed would enable the utility to realize at least that much. It was contended on behalf of the utility that the return would be less than six per cent, and that
". . . if the returns amount to the smallest fraction less than the Commission said the company was entitled to earn, the order must be set aside as illegal." *Page 264 
Concerning this argument, the court said (p. 182):
"The question presented in this case is not what the Commission thought the Company should receive as a return on its investment, but whether the rates fixed are confiscatory. It cannot reasonably be said that if the returns under the rates fixed will fall slightly under 6 per cent., say to 5.95 per cent., 5.5 per cent., or even 5 per cent., the Commission's order will result in confiscation, and that is the test. It is a matter of such common knowledge that we take judicial notice of it that interest rates are extremely low, lower than ever known in this country. Fortunate indeed is the investor who can realize as much as 5 per cent. on good investments, and many are satisfied with 3 1/2 per cent.
"In the case of Alexandria Water Co. v. City Council ofAlexandria, 163 Va. 512, 177 S.E. 454, 495, decided in the latter part of 1934, the court disregarded the suggestion and argument here made, saying:
"`But we are not here concerned with what the commission in the exercise of its legislative discretion deems a fair and reasonable return. Upon a judicial review, we are concerned only with this ultimate question, Are the rates prescribed confiscatory?'"
In the case of Alexandria Water Co. v. Alexandria, 163 Va. 512, 177 S.E. 454, the supreme court of appeals of Virginia reviewed an order of the state corporation commission. The supreme court of Louisiana, in the case above cited, quoted from the opinion of the Virginia court, which also said:
"It is a matter of common knowledge that, under the depressed business conditions which have existed since the early part of 1930, the end of which has not yet come and cannot be predicted with any confidence, a company (whatever its business) which has been able to earn a net return of as much as 4.98 per centum upon the present value of its property used and useful in the business has been very fortunate, and that few companies have been able to do so. In view of this fact, we are of opinion that it cannot be said with reason that the prescription of rates for a public utility company which yield to it a net return of 4.98 per centum is, in effect, a confiscation of its property, or deprives it of its property without due process of law."
[21] In determining whether an established rate of return is subject to the constitutional objection that it deprives *Page 265 
the utility of its property without due process of law, business conditions as they exist at the time the rate is established and other kindred matters as affecting the utility in question are important considerations. In the case of United Railways etc.Co. v. West, 280 U.S. 234, 249, 74 L.Ed. 390, 50 S.Ct. 123, the court said:
"What is a fair return within this principle cannot be settled by invoking decisions of this court made years ago based upon conditions radically different from those which prevail today. The problem is one to be tested primarily by present day conditions. . . . Nor can a rule be laid down which will apply uniformly to all sorts of utilities. What may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk."
The rate-making authority and the courts take notice of existing economic conditions, together with price trends and value levels. Concerning these matters, the supreme court of the United States, in the case of Los Angeles Gas etc. Corp. v.Railroad Commission, 289 U.S. 287, 308, 77 L.Ed. 1180,53 S.Ct. 637, in considering the question of historical cost of the utility's property, said:
"We have had occasion to take judicial notice of the high level of prices of labor and materials prevailing not only from 1917, as incident to the war, but also in 1922 and 1923 and that there was no `substantial general decline' in such prices from that time to 1926."
The cases of Ohio Bell Tel. Co. v. Public UtilitiesCommission, 301 U.S. 292, 81 L.Ed. 1093, 57 S.Ct. 724; SouthernBell Tel. Tel. Co. v. Louisiana Public Service Commission,supra; and Peoples Gas Light etc. Co. v. Slattery, supra, are to the same effect.
In the early cases in which orders of rate regulating bodies were considered, courts sometimes used the word "interest" in connection with a fair return which the utility is entitled to earn upon its capital investment. The use of the word interest in connection with this phase of public utility regulation was unfortunate, as the moneys earned by the utility are not properly interest, the phrase fair return more properly expressing the idea. *Page 266 
In the case of State ex rel. Oregon R. N. Co. v. Clausen,63 Wn. 535, 116 P. 7, this court referred to "a fair interest return," the same expression having been employed in the case ofState ex rel. Webster v. Superior Court, 67 Wn. 37,120 P. 861.
In the case of State ex rel. Spokane v. Kuykendall, 119 Wn. 107,205 P. 3, this court, after referring to the "fair and reasonable return upon its investment" which a utility should receive, again referred to the "fair and reasonable return by way of interest or profit upon the reasonable value" of the utility property used and useful in the public service.
We call attention to these expressions appearing in former decisions of this court, because we have now adopted the phrase fair return as correctly expressing the amount of revenue which a utility should earn upon the rate base established by the regulatory authority.
In the early case of Bluefield Water Works etc. Co. v. PublicService Commission, 262 U.S. 679, 692, 67 L.Ed. 1176,43 S.Ct. 675, the supreme court of the United States said:
"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally."
This clear and comprehensive statement has been well *Page 267 
nigh universally approved, and was reaffirmed by the supreme court in the case of Los Angeles Gas etc. Corp. v. RailroadCommission, 289 U.S. 287, 77 L.Ed. 1180, 53 S.Ct. 637.
In the case of United Railways etc. Co. v. West,280 U.S. 234, 251, 74 L.Ed. 390, 50 S.Ct. 123, the supreme court said:
"It is manifest that just compensation for a utility, requiring for efficient public service skillful and prudent management as well as use of the plant, and whose rates are subject to public regulation, is more than current interest on mere investment."
The difficulty with the statement last quoted is that "current interest on mere investment" covers too wide a range to afford a valuable basis of comparison, the interest rates depending upon the nature of the investment, the time the loan will run, and other factors too numerous to mention.
While in determining the rate of return to be allowed a utility the regulating authority should consider current rates of interest asked and received on investments or loans, that matter is only one of many elements which must be taken into consideration.
In the case at bar, respondent introduced much evidence concerning the history of its stock structure, its bonded indebtedness, the ratio of debts to capital obligations, and its general financial operations. This evidence is in the record, and is given due consideration.
In Puget Sound Electric Co. v. Railroad Commission, 65 Wn. 75,117 P. 739, Ann. Cas. 1913B, 763, this court affirmed an order of the commission fixing seven per cent as the rate of return to be realized by the utility, calling attention to the fact that the utility had loaned a substantial sum to an allied corporation at six per cent interest. Concerning this matter, the court said:
"If appellant regards 6 per cent as a proper return for its investment in the Tacoma Railway Power Company, it should be willing to accept 7 per cent as a proper return for its investment in its own property." *Page 268 
In the instant case, it appears that respondent has borrowed from the trustee of its pension fund sums aggregating over ten million dollars, for which it pays the trustee four per cent per annum interest. While this is not a controlling factor, it is a circumstance which the department was entitled to consider, and should also be considered by the court in determining whether or not the rate of return fixed by the department is confiscatory.
Orders by regulatory bodies establishing rates of return upon investment are always subject to revision in view of changed circumstances. Illinois Bell Tel. Co. v. Gilbert, 3 F. Supp. 595.
In the Matter of the Application of N.W. Bell Tel. Co., 6 N.W.2d (S.D.) 165, it was held that an order of the regulatory authority fixing three and one-half per cent as the rate of return was confiscatory.
The supreme court of Illinois, in the case of Peoples GasLight etc. Co. v. Slattery, 373 Ill. 31, 25 N.E.2d 482, held that a return of five per cent fixed by the rate regulating authority could not be held confiscatory. The court called attention to the fact that the company was paying four per cent on several million dollars of borrowed money, and that the test of confiscation was the return which could reasonably be procured upon an investment of equal amount and equal stability.
Respondent vigorously argues in support of the decree of the trial court, discussing the testimony of the witnesses and the exhibits introduced.
In connection with such a question as this, both the department and the courts take notice of existing conditions, and give consideration thereto, as well as to the evidence in the record. In view of all matters properly to be considered, it becomes the duty of the department to fix a just and reasonable rate of return to be realized by the utility, and on review of such an order by the utility, the order of the department will be affirmed by the courts, unless it appear that the rate fixed is so low as to amount in law to confiscation of the utility's property. *Page 269 
Discussion of this phase of the case might be continued at great length, to no advantage. The question is, of course, of great importance, both to respondent and to the rate payers, but further review of the evidence and the authorities would merely lengthen an opinion which is already too long.
[22] Bearing in mind, then, that, as to this phase of the matter, the sole question before us is whether or not the rate of return fixed by appellant at five per cent, must be held to be so low as to amount to confiscation of respondent's property, we hold that the rate fixed is not confiscatory, and that the superior court erred in reversing the order of the department upon this phase of the case, and in declaring that respondent is entitled to a return of not less than six per cent upon the fair value of its property.
In connection with this matter, we have found it unnecessary to consider the arguments advanced by appellant Telephone Users' League of Washington, Inc., the appellant named agreeing with appellant department in arguing for reversal of that portion of the decree of the trial court declaring that a fair return to be received by respondent upon the value of its property should be not less than six per cent. The argument advanced by appellant league is based upon the Federal revenue act of 1942, Public Laws No. 753, approved October 21, 1942. As we hold that the trial court erred in making that portion of its decree above referred to, we find it unnecessary to discuss the arguments advanced by appellant league for reversal of that portion of the decree appealed from.
We shall now consider the cross-appeal of the cities of Spokane, Tacoma, Seattle, et al. These cities appeared before the department, and brought the departmental orders before the superior court by way of writs of review. Deeming that they had been aggrieved by the decree entered by the superior court, the cities appealed from the decree, and appeared before this court, presenting the question in which they are interested both by way of briefs and oral argument. *Page 270 
It appeared before the department that several cities had granted respondent franchises authorizing respondent to place its poles, wires, and conduits in the public streets, the franchises requiring respondent to pay to the cities, respectively, certain sums of money based upon agreed percentages of respondent's gross income from the rate payers residing in the respective cities, and that certain of the cities had levied excise or occupation taxes which respondent was required to pay by way of percentage upon its gross income received from the respective communities.
In the schedules which respondent filed with the department in 1938, it was provided that there be passed on to respondent's rate payers residing within the limits of the cities which had levied occupation taxes which respondent was required to pay, the amount paid by respondent on account of such taxes. The schedules were suspended, pending the hearing before the department, and never became effective. In its order of July 6, 1940, the department denied respondent's application to pass the respective occupation taxes to its rate payers, but, in its order of October 31, 1940, the department directed respondent to pass such taxes along to its rate payers. Pursuant to this order, there would be added to the bill received by each rate payer residing within the limits of the city which levied an excise tax, his proportion of the tax levied on respondent for the privilege of doing business in that city.
In its order of December 16, 1940, the department entered the supplementary order above referred to, fixing the schedule of rates to be charged by respondent, and further providing that "all occupational, franchise and similar municipal charges may be passed on" to the rate payers.
It does not appear that respondent had at any time requested that moneys collected by the cities pursuant to franchises enjoyed by respondent be passed on to the rate payers. Neither does it appear that any notice was given by the department of any hearing to be held concerning the passing to the rate payers of moneys collected pursuant to *Page 271 
franchises or paid otherwise than pursuant to occupation taxes, or taxes of a similar nature.
Appellant cities assign error upon that portion of the decree which reversed the departmental order of July 6, 1940, in so far as that order permanently suspended respondent's application to pass to its rate payers municipal occupation taxes. Error is also assigned upon the refusal of the trial court to include in its reversal of the order of October 31, 1940, a direction to the department to eliminate from that order all authorization or direction to pass such taxes along to the rate payers. Appellant cities make a similar assignment of error based upon the refusal of the trial court to include in its reversal of the order of December 16, 1940, a similar provision.
We shall refer to the appellant cities as the cities, to appellant department as the department, and to the telephone company as respondent. The cities have filed a brief upon the questions presented on their appeal, and the 345 cities which are members of the National Institute of Municipal Law Officers have, through their counsel, filed a brief signed by members of the institute's committee on public utilities, as amici curiae.
Respondent has filed a brief answering the brief filed by the cities, while appellant department in its opening brief simply refers to the discussion of the subject in its October order, and adopts the brief of respondent above referred to as its argument upon the questions raised by the cities' appeal.
We shall first consider the matter of municipal taxes, leaving the question of franchise exactions for separate consideration.
The cities contend that the powers enjoyed by the department pursuant to Rem. Rev. Stat., § 10339 et seq., constitute an exercise of the police power, and that the department exceeded its authority in ordering that the municipal charges above referred to be passed on to the rate payers, arguing that such an order constitutes an exercise of the taxing power. In this connection, it is contended that the departmental order in effect transforms the tax from one *Page 272 
properly levied by a taxing authority on the owners of the utility for the privilege of engaging in business, at a reasonable profit, within the limits of the city, to a tax on the rate payers within the limits of the city, from whose payments that profit accrues. The cities argue that, pursuant to its statutory authority, the department may determine the reasonableness of rates and service rendered, but that, in determining the amount of a fair return to the utility, the department must take the tax burden as it finds it, and that the order of which the cities complain attempts, without warrant of law, to shift that burden.
Cities are municipal corporations and, as agencies of the state, exercise delegated taxing powers. Authority to levy occupation taxes is conferred on cities of the first class by Rem. Rev. Stat., §§ 8966 and 8981 [P.C. §§ 678 and 680]; upon cities of the second class, by § 9034 [P.C. § 742]; upon cities of the third class, by § 9127 [P.C. § 797]; and upon cities of the fourth class, by § 9175 [P.C. § 837].
Not all of the cities within the state of Washington within which respondent does business have levied an occupation tax which is paid by respondent, and the rate of the tax levied varies greatly in the different cities. The city of Seattle has levied a tax amounting to four per cent of respondent's gross collections in that city; in the city of Spokane the levy amounts to three per cent; in Bellingham to three and one-half per cent; in Port Townsend to two per cent; and in Olympia, Shelton, and Dayton, to one per cent. The first tax was levied by the city of Seattle in 1932, and the latest by the city of Dayton in 1939. The right of the city of Seattle to levy the tax referred to was upheld by this court in the case of Pacific Tel. Tel. Co. v.Seattle, 172 Wn. 649, 21 P.2d 721, the judgment of this court having been affirmed by the supreme court of the United States, Pacific Tel. Tel. Co. v. Seattle, 291 U.S. 300,78 L.Ed. 810, 54 S.Ct. 383.
It should be noted that several cities are served by independent telephone companies, and not by respondent. *Page 273 
Pursuant to our decision, the three departmental orders will stand reversed, and be remanded to the department for further proceedings. What the final order of the department will be as to the rates which respondent may charge, or whether or not the department will permit or direct respondent to pass along to the rate payers of the respective cities the municipal exactions which are now under discussion, cannot be foretold. Upon the record, the question of whether or not the department has authority under the law to direct or permit respondent to pass to the rate payers the municipal exactions above referred to, is now before us for consideration.
The cities argue that, by the provision in the department's order of December 16, 1940, the department is in effect unlawfully attempting to exercise the taxing power.
Beyond question, for rate-making purposes, the municipal exactions in question are properly charged to the company's operating expense account. The company, by lawful authority, is required to pay them.
[23] The department was of the opinion that an excise or occupation tax levied by a city against respondent by way of a percentage on respondent's gross income from that city, if included in general operating expense and reflected in statewide rates, as matter of law constitutes an unjust discrimination against rate payers using telephones in portions of the state where no such tax, or a lesser tax, has been imposed. It appears that, as of December 31, 1938, 73.4 per cent of the telephone stations in the state were located in Spokane, Tacoma, and Seattle, 48.7 per cent being in the latter city. In the same year, the cities referred to contributed 80.3 per cent of respondent's revenues, 55.8 per cent being collected in Seattle. Based upon these figures, the cities argue that any discrimination against persons living without the cities named is so slight as to be negligible. Nevertheless the discrimination exists; the point urged is as to degree only.
In connection with this phase of the argument, the cities cite the case of Seattle v. Puget Sound T.L. P. Co., *Page 274 103 Wn. 41, 174 P. 464, in which the city of Seattle sought recovery of the two per cent of the defendant's gross income due to the city under defendant's franchise, which the defendant had refused to pay, on the ground that the exaction was discriminatory. It appeared that the same defendant owned a street railway system in the city of Bellingham, where no payment by way of a percentage of gross income was exacted. The court held that the tax was not invalid because of unlawful discrimination, saying:
"Can it be said that a municipality cannot exact a different rate of tax because some one city has failed to exact a tax upon the property within its boundary? Manifestly not."
The case is not at all in point here, as no one is contending that the tax is invalid. The only question before us is whether the excise tax levied by the city of Seattle should be included generally in respondent's operating expenses and spread throughout the state, or whether the amount of the tax should be collected by respondent from the Seattle rate payers.
The supreme court of Illinois, in the case of Elmhurst v.Western United Gas etc. Co., 363 Ill. 144, 1 N.E.2d 489, considered the matter of franchise payments. It appeared that the utility company furnished gas to a district in northern Illinois. The state rate-making authority authorized a schedule of rates to be charged for gas throughout the territory served, excepting five cities within which the utility was permitted to add to its charges a percentage differential sufficient to meet the annual payments which the utility was required to pay each municipality by virtue of franchise ordinances pursuant to which the utility operated in the five cities. Under its franchise from the city of Elmhurst, the utility was required to pay to the city three per cent of the gross receipts of the business done within the city. The city of Elmhurst attacked the rates, contending that the rate schedule established unreasonable differences between localities and classes of service, in contravention *Page 275 
of the statute of the state establishing the regulatory authority. Concerning this matter, the supreme court said:
"The discrimination forbidden by paragraph 53 (sec. 38) is as to rates between customers of the same class in the territory. Customers residing in subdivisions of the same territory served by the public utility where an annual percentage of its gross receipts is exacted from the public utility, are not in the same class as those patrons who live in a municipality where such percentage is not exacted.
"No question is raised as to the fairness or uniformity of the basic rate in the territory served. The controversy centers around the three per cent added to the basic rate in appellant city which, in turn, exacts from the public utility the same percentage computed on the basis of its gross receipts. In this respect appellant, with the other four cities named, differed from the other municipalities in the northern division.
"It is argued that annual franchise payments should not be charged against the patrons of the appellant, and that the practical effect is to give those who are non-users of gas the benefit of the franchise rate paid by gas users. Such is the effect. It is seldom that the imposition of a tax or franchise charge does not work a hardship on some individuals. The human race has not yet reached that degree of perfection whereby taxing systems have been evolved which in their practical operation do not, on occasion, work some degree of injustice to some individuals.
"Appellant contends that the payment of the annual franchise charge is nevertheless a capital investment which should be spread over the whole northern territory, and that because a lump sum was not paid for the franchise at the time it was granted, but the franchise is paid for on a percentage basis, that fact does not justify the charging of such tariff to operating expenses rather than capital investment. While appellant cites various public utilities reports in support of its position, it refers us to no court decisions determining such principle. Public utility reports are not considered as authority in this court on an issue involving the review of an order of the commission."
The court held that franchise payments are properly chargeable as an element of the cost of operation, which should be borne by the consumers of the utility's product or service, and that it would be unjust to spread the burden *Page 276 
of the annual franchise payment over the whole territory served by the utility. The court also held that
"There is no interference with the contract created by the original franchise and acceptance thereof by the predecessor of the gas company, and the order of the commission in nowise contravenes the constitutional inhibition against the impairment of contracts."
While as hereinafter stated we differ with the supreme court of Illinois in its holding as to franchise payments, the holding of the court supports our conclusion that excise taxes levied by a city should be reflected in the rates charged within that community.
There is no basis for the argument advanced by the cities to the effect that the department is seeking to exercise the taxing power, or to interfere with the exercise of that power by the cities. The only question concerns the allocation of the moneys paid by respondent to the cities under a taxing ordinance or pursuant to franchise provisions, whether these payments will be included in respondent's general operating expenses or segregated and passed to the rate payers in the respective municipal corporations to which the moneys are paid.
By Rem. Rev. Stat., § 10391, the department is vested with authority over rates to be charged by public utilities. In the case of State ex rel. Seattle v. Public Service Commission,103 Wn. 72, 173 P. 737, this court held that the department (then the commission) had the power "to fix reasonable or sufficient rates at the request of the carrier, notwithstanding the franchise contract." An order of the commission approving a tariff filed by the utility in disregard of a franchise provision providing for commutation tickets was upheld. It would seem that the case cited is in some conflict with at least one decision of this court, but it is not necessary to consider that matter here. In any event, the department enjoys wide powers in exercising its authority to fix rates.
As above stated, the bases upon which excise taxes have been levied by the cities vary greatly, ranging from *Page 277 
four per cent of the gross income to one per cent. No one can say how far this variation might be extended. It suggests large possibilities of municipal action. Manifestly there is an element of unjust discrimination in allowing one community to levy and collect from respondent or any public utility engaged in business throughout the state an occupation tax which in turn the utility would collect by a statewide increase in rates. If such taxes were generally levied and varied little in the percentage of gross revenue by which the tax is computed, the matter might well be unimportant; but the contrary is the fact.
Taxes, whether denominated occupation taxes, business taxes, or taxes for the privilege of using public streets, are imposed by a legislative authority, which, unless the imposition is held unlawful by the courts, has the right to enforce collection. There is no element of contract in connection with such a tax.
We are convinced that the department, in so far as such taxes are concerned, has the power to fix special exchange rates applicable to the different communities, which will in effect require the rate payers in each community to absorb a sum equal to the amount of the tax which respondent is required to pay to that municipality. More than this, the department cannot do.
Whether or not the present municipal tax situation in this state at this time requires that the department follow the procedure stated, is a question to be determined by the department.
In connection with this matter, amici curiae in their brief frankly state that excise taxes levied by cities, together with payments made pursuant to municipal franchises, are universally considered proper items of operating expense, to be so considered by state rate-making authorities, amici curiae arguing, however, that such disbursements should be covered by statewide rates, and not by differentials reflected in rates applicable to certain communities. Amici curiae state that the passing on of municipal taxes to the rate payers in the community levying the tax is contrary *Page 278 
to all decisions of all state and Federal courts and the rulings of all state public utility commissions. None of these decisions, however, is cited, and the decision of the Illinois court above referred to is to the contrary, as are several orders of state rate-making bodies.
[24] The matter of payments to municipalities under franchise provisions presents a different question from that last discussed concerning payments made pursuant to municipal taxing ordinances.
A franchise is "a special privilege conferred by the government on an individual or individuals and which does not belong to the citizens of the country generally, of common right." 37 C.J.S. 142. Such a franchise as those with which we are here concerned is a contract between a municipal corporation and a person who has applied for leave to engage in certain business operations of a public nature within the limits of the municipality. Franchises granted to respondent include the right to place poles, wires, and conduits within the public streets. Any person desiring such a franchise must apply therefor to the municipal corporation. If his application be favorably considered, a franchise is offered upon certain conditions. This offer the applicant may accept or refuse. If accepted, the franchise provisions become binding on all persons concerned, save as heretofore noted as to provisions fixing rates.
Franchises granted to public utilities vary greatly as to the obligations assumed by the grantee. Respondent is operating under some franchises which require payment of certain percentages of respondent's gross income received within the territorial limits of the grantor. Under other franchises, respondent is required to furnish to the municipality without charge certain telephone installations and service. On the other hand, respondent, under the franchises, enjoys the privilege of using the public streets, subject to certain conditions, for installation of its apparatus. This latter right is, of course, valuable, and indeed necessary, and is a privilege for which a cash payment may reasonably be exacted. If respondent desired to use some *Page 279 
available city property, it might well negotiate a lease and pay a rental therefor. If the use of the property were necessary in the conduct of respondent's business, such rental would undoubtedly be considered by the rate-making authority a proper operating expense.
It might well be that respondent would find it convenient to procure an easement over private property outside the municipal limits, for the purpose of placing its poles and wires. Money paid for such an easement would certainly be properly classed as an operating expense. It seems reasonable to consider that payment of a certain proportion of respondent's gross income collected from rate payers within the city limits be considered as compensation for use of the streets, if no other provision has been made for the payment for the privilege. Such franchise payments, if considered as compensation for the use of the streets, would be properly classed as a general operating expense.
If the payments called for by a franchise appear excessive or out of proportion to the privilege accorded to the utility to use city property, the rate-regulating authority would have power to fix the proper proportion of the payment to be allocated to operating expense.
The right of the city under a franchise to be furnished, without charge, with telephone installations and service would be difficult to measure in dollars, and we do not understand that the department has authorized respondent to compute the value of such service and charge the same to the city rate payers.
[25] This court has held that the department has no jurisdiction to abrogate franchise provisions, with the exception above noted in connection with the matter of rates.
In the case of State ex rel. Seattle v. Seattle Rainier V.R.Co., 113 Wn. 684, 194 P. 820, 15 A.L.R. 1194, it was held that a provision in the franchise granted to the street railway company, binding the company to carry policemen and firemen in uniform while engaged in the discharge of their official duties, was a binding obligation upon the grantee of the franchise, not subject to abrogation. *Page 280 
In the case of Monroe Water Co. v. Monroe, 135 Wn. 355,237 P. 996, it appeared that the plaintiff was the holder of a franchise from the city of Monroe authorizing the plaintiff to supply the town and inhabitants with water. It was provided in the franchise that during the term thereof the grantee should furnish to the town free water for the extinguishment of fires, free hydrant rental, free water for street flushing, etc. The franchise was granted subsequent to the enactment of the public service commission law, and the water company filed with the commission a new schedule of rates and charges calling for payment by the town of rental for hydrants. The department approved the rates requiring payment by the town of rental for hydrants. The town refusing to pay, the water company brought suit to recover the rentals pursuant to the revised rates, and recovered judgment in the superior court. The sole question presented to this court concerned the power of the department to enter the order authorizing the water company to charge the town rental for the use of hydrants. The case was heard before a department of this court, which affirmed the judgment of the trial court in favor of the water company. Monroe Water Co. v.Monroe, 130 Wn. 351, 227 P. 516.
A rehearing was granted and the matter considered by this court sitting En Banc. The departmental decision was overruled and the judgment of the lower court and the order of the department were reversed. This court, following two of our prior decisions, held that the department had no authority to authorize the utility to abrogate the provision of the franchise above referred to. The court referred to the franchise as a contract between the utility and the municipality, and held that the former was bound by the provisions of the franchise.
This court, then, while upholding the right of the department to change franchise provisions as to rates, has held that the department has no right to abrogate franchise conditions such as those referred to in the two cases last cited.
[26] In the orders before us for review, the department *Page 281 
did not attempt to interfere in any manner with the provisions of the respective franchises under which respondent is conducting its business in the cities referred to. We have discussed this matter because appellant cities apparently contend that by its orders the department was in some manner interfering with the carrying out of the franchise provisions. Such is not the case.
We are convinced, however, that payments made by respondent under franchises such as those here in question, as matter of law fall within the classification of general operating expenses, and that the department erred in the provision of its December order above referred to, according to respondent the right to charge such franchise payments to the rate payers of the respective cities.
Such payments differ basically from taxes paid pursuant to excise or similar taxes levied by a municipality. Payments made under franchises such as those here in question are based upon contracts which grant to respondent, inter alia, the right to install portions of its equipment in the public streets. The installation of respondent's plants pursuant to the franchise contracts benefits not only the residents of the cities, but is a benefit to rate payers living without the city limits. In entering into these contracts, respondent was enlarging its service and making the same more generally useful and convenient.
While the distinction between payments made by respondent pursuant to franchises which it enjoys, and payments made pursuant to municipal taxing ordinances may seem rather finely drawn, we are convinced that a distinction in fact exists, and that, as to the former class, the law requires that such payments be considered as general operating expenses, and that (subject to the exception above noted as to an excessive or unreasonable exaction) the department lacks legal authority to direct or permit respondent to pass such payments along to the rate payers within the respective cities within which respondent is operating pursuant to the franchises. *Page 282 
We have referred above to the case of Elmhurst v. WesternUnited Gas etc. Co., supra, decided by the supreme court of Illinois, April 17, 1936. In that case the court considered only payments made to the city pursuant to franchise provisions. We are in accord with the reasoning of the supreme court of Illinois as applied to municipal taxing ordinances, but we are of the opinion that a different rule should be applied as to payments required by municipal franchises. Certainly the inclusion of municipal exactions in local rates constitutes an exception to the general rule. Such exceptions should be recognized only when not so to consider them would cause a manifest injustice. It would seem that the case presented to the Illinois court did not involve a utility engaged in statewide operations. Just how much territory the utility which was a party to that proceeding served cannot be determined from the opinion. The situation was not entirely comparable to that presented in the case at bar.
[27] In connection with the matter under discussion, it may be observed that, because of its power over contract payments by a public utility, the department might well, if it deemed a franchise exaction so excessive as in part to amount to a tax, apportion the payment between general operating expense and the local rate payers.
As to the question under discussion, it should be noted that it appears from the record that the department included in its December order the provision above referred to, concerning franchise payments, without any previous notice to any of the parties. This was a matter concerning which respondent and the cities were entitled to be heard.
We have concluded, however, to decide the question, being convinced that the department has no authority to make the order as to franchise payments. We do this in order to expedite final completion of this litigation.
Appellant Telephone Users' League of Washington, Inc., a corporation, appeared by counsel before the department, and contested all claim of respondent to increase its *Page 283 
rates, and particularly objected to respondent's application to the department for leave to make some changes in its operations involving the employment of certain measured services.
The department disallowed respondent's application for permission to install such services, and, in its decree, the trial court did not reverse, though it did not expressly affirm this action of the department. Telephone Users' League then appealed to this court from the decree of the trial court, desiring to be free to present before this court its position in opposition to the installation of new metered services, if that question should be here presented. Respondent did not appeal from the decree of the superior court, and the order of the department disallowing proposed measured services, and referring to the "station to station" method of rate-making as distinguished from the "board to board" method, of which order appellant Telephone Users' League entirely approves, is not here contested. It is therefore unnecessary to discuss any question in connection therewith.
The decree appealed from will be modified as hereinabove directed, and, as modified, is affirmed. The three departmental orders which were reviewed before the superior court stand reversed (save as to the portions of such orders not reversed by the trial court), in accordance with the provisions of the decree appealed from, and will be remanded to the department for further proceedings in accordance with the decree as modified herein.
No costs will be taxed in this court in favor of any party to the proceeding.
SIMPSON, C.J., MILLARD, STEINERT, BLAKE, ROBINSON, MALLERY, and GRADY, JJ., concur.
JEFFERS, J., did not participate. *Page 284